In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-1207

JANET SPECIALE,

*Plaintiff-Appellee,*

*v.*

BLUE CROSS AND BLUE SHIELD ASSOCIATION
and NON-CONTRIBUTORY NATIONAL LONG TERM
DISABILITY PROGRAM,

*Defendants-Appellants.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 5390—**David H. Coar**, *Judge.*

———————

ARGUED SEPTEMBER 7, 2007—DECIDED AUGUST 7, 2008

———————

Before BAUER, POSNER, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Janet Speciale was an employee of the Health Care Service Corporation ("HCSC") for a little over two years when she applied for long-term disability benefits under Blue Cross and Blue Shield Association's ("Blue Cross") Non-Contributory National Long Term Disability Program ("the Program"). Speciale suffered from fibromyalgia since 1986, but in 2001 claimed an exacerbation of her symptoms disabled her from

working. The Program's Medical Review Committee ("MRC") denied Speciale's claim and her subsequent appeal. It found that her symptoms, although trouble-some, did not rise to the level of disability because two of her treating physicians believed she could work with certain physical restrictions. Speciale filed this action in the district court, and both parties moved for sum-mary judgment. Applying an arbitrary-and-capricious standard of review, the district court overturned the MRC's decision and granted Speciale's application for benefits. This appeal followed. Because the reasons given by the MRC for its decision were reasonable and supported by the record, we reverse the district court's judgment and remand for entry of summary judgment in favor of Blue Cross and the Program.

## I. Background

Speciale worked for HCSC as a senior account executive from June 1998 through November 7, 2000. HCSC is an independent licensee of Blue Cross, and as an employee, Speciale was covered by the Program, entitling her to benefits if she should ever become disabled.[1] The Program

---

[1] Section 1(p) of the Program contains the relevant definition:

"Disabled" means . . . that a Participant is, determined on the basis of medical evidence satisfactory to the Committee, wholly prevented, by reason of mental or physical disabil-ity, from engaging in any occupation comparable to that in which he was engaged for the Employer, at the time his disability occurred. An occupation is considered compara-ble to that in which the Participant was engaged for the

(continued...)

is administered by the National Employee Benefits Com-
mittee ("NEBC") of Blue Cross. The NEBC delegated day-
to-day responsibilities for the Program to the National
Employee Benefits Association ("NEBA"), which in turn
assigned the authority to determine claims to the Med-
ical Review Committee.

Speciale's job was hectic; she was required to respond
constantly to problems and emergencies with clients or
brokers and spent nearly half of her time traveling to
meetings. Her job required fine-finger movement, talking,
and listening, as well as climbing stairs and lifting up to
50 pounds from either the floor or table level. She was
also required to work overtime seven or more times per
month.

## A. Speciale's Medical History

Although her job could be considered stressful for the
average person in good health, Speciale suffered from a
number of medical conditions that made her position even
more difficult. She was diagnosed with fibromyalgia in
1986, and her symptoms, though initially manageable,
began to worsen in 2000. Dr. Kevin Snydersmith, her
physician, recorded in September of 2000 that Speciale
complained of severe back pain, as well as pain and
numbness in her left shoulder and leg. Snydersmith did
not think all of her symptoms were explained by the
fibromyalgia, so he diagnosed her with chronic pain

---

(…continued)
  Employer if the earnings potential of the occupation is
  comparable to the employee's salary range at the time
  he became Disabled.

syndrome. He noted that her job is "fairly intense" and she had used most of her sick days because of her medical problems.

Dr. Snydersmith's diagnosis of chronic pain syndrome set in motion treatment and diagnostic regimes that ultimately resulted in Speciale's application for long-term disability benefits on April 18, 2001. In October 2000 Dr. Snydersmith noted that Speciale was on at least four different medications and also received shots of Toradol once or twice per month to control her pain. That same month Speciale met with rheumatologist Dr. Ann Winny, who spoke at length with Speciale and believed her symptoms were "progressively worsening." Speciale mentioned she might take time off from work to see if the stress of her job was the cause of her deterioration. Dr. Winny believed the symptoms were due to fibromyalgia and chronic pain syndrome but did not rule out the possibility of multiple sclerosis ("MS").

Speciale met with Dr. Brian O'Shaughnessy on November 1, 2000. After evaluating her symptoms and a recent MRI of the brain, he believed she was suffering from some form of demyelinating disease and wanted her to have a lumbar puncture to further investigate this possibility. Dr. O'Shaughnessy reiterated his suspicions in February 2001 when Speciale came into his office and reported that she was dizzy and tired, suffered extreme back pain, and had difficulty walking. Dr. O'Shaughnessy thought this could be explained by an exacerbation of a demyelinating disease but noted that Speciale had an appointment with Dr. Boris Vern, head of the multiple sclerosis clinic at the University of Illinois, for testing. Dr. O'Shaughnessy reported to Blue Cross on March 17 that Speciale could not work due to her severe pain and

fatigue and her return to work was "indefinite pending [the] outcome of testing" by Dr. Vern. Tests conducted on March 22 indicated that Speciale's "sensory symptoms are overshadowed and probably colored by her chronic pain, which seems to [be] of myofascial origin." Dr. Vern thought that MS could be a possibility but that it was "not strongly supported by the available lab studies."

While under the care of Dr. O'Shaughnessy, Speciale continued to see Dr. Snydersmith. In mid-January 2001, he provided her with a "quad" cane to ease her walking difficulties. His notes reveal that Speciale was suffering from frequent, painful kidney stones. She was put on various medications, including Vicodin, and at one point was admitted to the emergency room for pain control and hydration. In February Snydersmith referred Speciale to physiatrist Dr. Dennis Keane. After an initial consultation, Dr. Keane wrote that Speciale's symptoms were somewhat alleviated after a vacation to Arizona; however, she still experienced a great deal of pain in her back that often radiated down her left leg. He seemed to assume that Speciale suffered from MS because she used a quad cane to help her "slightly unsteady gait from her MS." He reexamined Speciale in early June and found her to be doing "dramatically better" after being placed on oral steroids.

Despite Dr. Vern's doubts, Speciale's other doctors believed she was suffering from symptoms related to MS. Dr. O'Shaughnessy wrote on May 17 that he doubted fibromyalgia accounted for her problems because "she has had [it] for 14 years and it has not caused" the symptoms of which she was more recently complaining. Less then a month later he wrote: "I feel her clinical picture is most compatible with multiple sclerosis. I do not see her

improving enough at this time to return to work." Dr. Snydersmith supported this diagnosis and found her symptoms were "likely due to developing MS." Dr. Winny agreed that Speciale "is probably disabled at this point" because her MS makes it difficult for her to walk.

Although Speciale's symptoms were serious, the tentative diagnosis of MS turned out to be inaccurate. Dr. Snydersmith told Blue Cross Nurse Sue Majewski on August 27 that the lumbar puncture did not confirm MS and the diagnosis was simply fibromyalgia that had been worsening in recent months. He could not predict how long Speciale could stand or walk each day as he no longer managed her case (Dr. Keane had taken over treatment of her pain).

Speciale's application for disability benefits was reviewed in August 2001 by Dr. E. Richard Blonsky, Blue Cross's senior medical consultant. Dr. Blonsky filled out a Physician's Recommendation Form and noted that there was no clear evidence of MS. He went on to state that Speciale suffered from fibromyalgia for 20 years and had worked, making this a "very marginal case." He also noted the lack of "confirmatory findings" and that the record contained "a lot of subjective complaints." He concluded: "I am not totally convinced of her disability. Were there any H.R., performance issues?" Dr. Blonsky reevaluated Speciale's file on September 5, this time confirming she did not have MS and reaffirming his previous finding that she was not disabled. Indeed, Dr. Keane had responded to an inquiry from the MRC by pointing out that Speciale suffered from back pain, leg spasms, weakness, and fatigue. Even so, he told the MRC that Speciale was physically capable of performing sedentary and light-duty jobs.

**B. Procedural History**

The MRC informed Speciale of its decision to deny her benefits application on October 30, 2001. It noted that Drs. Snydersmith, O'Shaughnessy, and Winny all believed Speciale had MS when they said she was disabled, but it was not known whether the negative lumbar puncture would change their opinions. Further, the committee noted that Dr. Keane believed she could work with some limitations (such as changing positions frequently) and his opinion carried weight because of his specialty in pain management. The letter also stated that the MRC conducted a vocational analysis, which revealed at least six career opportunities in the surrounding area that would pay a comparable salary while still accommodating Speciale's restrictions.

Speciale timely appealed the denial of benefits. She supplemented the record with new evidence, including progress notes and a functional-capacity questionnaire from Dr. Winny and progress notes from Dr. Keane. The questionnaire noted Speciale's "marked limitation" in dealing with work-related stress due to her fibromyalgia. Her physical limitations were also quite severe: she could only sit for 10 minutes and stand for 15 minutes in a 60-minute period; she had to walk every 30 minutes for at least 5 minutes at a time; she needed a job that permitted shifting positions and allowed her to take unscheduled breaks; Speciale could not lift more than ten pounds and was limited in her ability to reach or handle objects repetitively. Finally, Winny noted that Speciale would have to be absent from work more than three times every month.

Dr. Blonsky reevaluated Speciale's file in April 2002. He spoke with Dr. Winny, who told him that trigger-point

injections help control Speciale's fibromyalgia symptoms. Dr. Winny also believed that a job that did not require driving or travel might be tolerable and could be attempted. Based on this, Dr. Blonsky concluded "that the claimant was not totally disabled [on] 5/1/01 or currently."

The MRC denied Speciale's appeal on May 8, 2002, in a letter written by Barbara Grant, R.N., the NEBC's assistant secretary and the director of the disability program for the NEBA. Grant noted that Dr. O'Shaughnessy's opinion was given little weight because he was not available for comment after it was revealed that Speciale did not have MS. Similarly, Dr. Snydersmith still thought Speciale was declining due to fibromyalgia but was no longer treating her and could not identify any present restrictions. Dr. Winny's functional-capacity questionnaire provided Speciale with her strongest argument, but the MRC did not give it great weight because Dr. Winny had told Dr. Blonsky that Speciale could likely work in a job that did not require travel. Finally, Dr. Keane believed that Speciale could work with certain restrictions. Grant had also asked Nurse Majewski to conduct a second vocational analysis, which confirmed the availability of comparable jobs that did not require bending or twisting, allowed for variable sitting and standing, and did not require travel.

After her appeal failed, Speciale sent the MRC a copy of a favorable ruling by the Social Security Administration granting her application for disability benefits. Speciale asked the MRC to reconsider its decision based on this new evidence. Grant responded, stating that reconsideration requests were not normally granted after a final decision. Grant also noted that Social Security rulings carried little weight because the Program used an alternate definition of "disabled."

Speciale filed this action in the district court seeking relief under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Both parties moved for summary judgment. The district court, applying an arbitrary-and-capricious standard of review, granted Speciale's motion and denied the Association's.[2] The court found Dr. Blonsky's and Nurse Grant's reasoning flawed because of the emphasis each put on the difference between subjective and objective evidence of pain. Further, the court believed that Grant had not sufficiently explained why she did not give weight to Dr. Winny's functional-capacity questionnaire. Based on these flaws, the court held the denial was "downright unreasonable." Blue Cross and the Program timely appealed.

## II. Discussion

### A. Standards of Review

We review a grant of summary judgment de novo. *Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 989 (7th Cir. 2005). Summary judgment is appropriate when "there is no genuine

---

[2] A denial of benefits is normally reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In such a case, the court applies the "arbitrary and capricious" standard. *Hess v. Reg-Ellen Mach. Tool Corp. Employee Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007). The district court found sufficient discretionary language in the Program and applied the more deferential standard. That ruling is not challenged on appeal.

issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Where, as here, the court is faced with cross-motions for summary judgment, "our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made." *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004) (internal quotation marks omitted).

The district court held, and the parties concede, that review of the MRC's denial of benefits proceeds under the arbitrary-and-capricious standard, and we will only look to ensure that the Program's decision "has rational support in the record." *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006) (internal quotation marks omitted). "Put simply, an administrator's decision will not be overturned unless it is downright unreasonable." *Id.* (internal quotation marks omitted). Although deferential, we do not "rubber stamp" the administrator's decision. *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003). However, "we will uphold the plan's decision as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005) (internal quotation marks omitted).

**B. Reasonableness of the MRC's Decision**

On appeal, Blue Cross and the Program argue that the district court misapplied the arbitrary-and-capricious standard and instead conducted a plenary review of the record by reweighing the relevant evidence. They maintain that the MRC's denial of benefits rested on two solid grounds that entitle it to deference. First, the MRC determined that the weight of the evidence—including Dr. Winny's belief that Speciale could attempt work with some restrictions and Dr. Keane's statement that she could engage in sedentary or light-duty jobs—did not support a finding of disability. Second, even if Speciale could not continue in her current position, other comparable employment opportunities existed that rendered her not disabled for purposes of the Program. Speciale responds by questioning the clarity of Dr. Keane's report as well as the basis upon which Dr. Blonsky made his recommendation to deny benefits. She also argues that the vocational analyses conducted by Blue Cross did not consider all of her symptoms and were therefore unreliable.

Speciale claims that Dr. Blonsky's review of her file—in which he noted a lack of "confirmatory findings" and pointed out that the record was only full of "subjective complaints"—was flawed in light of our decision in *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914 (7th Cir. 2003). There, we held that the plan acted arbitrarily and capriciously in denying a claim for benefits because its primary medical consultant stated that sufferers of fibromyalgia could never be disabled because the pain experienced was entirely subjective and not capable of being confirmed by objective findings. *Hawkins*, 326 F.3d at 919. However, as we noted

in *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007), "[a] distinction exists . . . between the amount of fatigue or pain an individual experiences, which as *Hawkins* notes is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured." Dr. Blonsky did not question that Speciale suffered from fibromyalgia or that she experienced constant pain; rather, he only pointed out the lack of objective evidence supporting Speciale's claim that her pain resulted in severe functional limitations rendering her disabled.

The only evidence of such limitations is the functional-capacity questionnaire completed by Dr. Winny. That form did indicate that Speciale was unable to cope with the stress of her job because it heightened her symptoms and limited her physical capabilities. Dr. Blonsky reported, however, that Dr. Winny believed Speciale would be able to go back to work on a trial basis so long as she was not required to travel.[3] Indeed, it was Dr. Winny who questioned—in her October 28, 2000 progress notes—"whether [Speciale] can continue her work which involves a lot of travel, [as] sitting in the car is very uncomfortable."[4] This restriction was then reincorporated

---

[3] Speciale points to 29 C.F.R. § 2560.503-1(h)(3)(v) that disallows the use of a medical consultant on appeal who was involved in the original benefit denial. However, that regulation applies only to claims filed on or after January 1, 2002. *See* 29 C.F.R. § 2560.503-1(o). Speciale filed her claim on April 18, 2001.

[4] Speciale argues that Dr. Winny's statement to Dr. Blonsky is inadmissible hearsay and should be disregarded. However, our task is only to review the reasonableness of the denial. A

(continued...)

into the second vocational analysis, which confirmed the availability of comparable employment that did not require travel.

Speciale contends that the vocational analysis undertaken by Blue Cross was inadequate because it did not consider side effects from her medication, fatigue, or inability to work overtime. However, none of these side effects were listed as definite restrictions by either Dr. Winny or Dr. Keane. Responding to a request for more information, Dr. Keane checked "yes" on a form asking if Speciale was "physically capable of performing the duties of a sedentary or light duty job with restrictions." Though he unnecessarily listed "[b]ack pain, leg spasms, weakness, [and] fatigue" as symptoms that "would have prevented her from working" if he had checked "no," his intent to indicate that Speciale could work with restrictions is clear. Keane goes on to note that Speciale needs "frequent changes of position" and she is "unable to bend/twist fully," both of which were included as restrictions in the second vocational analysis conducted by Nurse Majewski.

Similarly, the functional-capacity questionnaire completed by Dr. Winny does not say that the claimed side effects were actual restrictions that prevented Speciale from doing any sort of work, sedentary or otherwise. Her conversation with Dr. Blonsky indicated just the

---

[4] (...continued)

plan administrator is not a court of law and is not bound by the rules of evidence. *Karr v. Nat'l Asbestos Workers Pension Fund*, 150 F.3d 812, 814 (7th Cir. 1998). Our review may thus consider even testimonial statements made outside of court if the MRC did so in rendering its decision.

opposite: she believed that Speciale could work despite her condition, so long as travel was not required. In other words, the symptoms Speciale wanted the MRC to weigh more heavily, in both its general review of her record and the vocational analyses, are not specified anywhere as restrictions by her physicians.[5] The MRC's denial letter demonstrates that the committee considered all of her symptoms but did not find them to be totally disabling in light of the absence of a physician's report stating unequivocally that those symptoms resulted in her total disability.

---

[5] Speciale argues that both *Abram v. Cargill, Inc.*, 395 F.3d 882 (8th Cir. 2005), and *Godfrey v. BellSouth Telecommunications, Inc.*, 89 F.3d 755 (11th Cir. 1996), support her position that the MRC acted unreasonably by not considering all of her symptoms in their totality. However, in both *Abram* and *Cargill*, the plan administrators irrationally limited their inquiry to only one of the claimant's medical conditions. *See Abram*, 395 F.3d at 886-87 ("The record shows three conditions that may be contributing to Abram's disability: PPS, depression, and obesity. . . . [T]he Plan focused only on Abram's PPS, asking whether it was the cause of her fatigue."). The defendants in *Godfrey* went further and completely ignored evidence of fibromyalgia submitted to them by the claimant. *See Godfrey*, 89 F.3d at 759 ("[T]he only rational explanation for the failure of the defendant's physicians to follow up on evidence which they did have and to ignore the effects of the medications that the plaintiff was taking is that *they knew that in fact the plaintiff was disabled* and following up leads and considering the effect of the medications would only confirm what any reasonable doctor would have already known."). Here, the MRC considered all the evidence and determined that it did not rise to the level of disability given the statements of Drs. Winny and Keane that Speciale could work with certain restrictions.

Speciale also mentions in passing that the MRC failed to consider the disability ruling and award of benefits by the Social Security Administration. However, as Speciale's counsel admitted in her June 2004 letter to the NEBC, the judgment was not sent to the Association until October 23, 2002—five months after the MRC rendered its decision on Speciale's appeal. Further, the Program's documents make clear that "entitlement to benefits under the Program shall not be dependent upon entitlement to [Social Security] benefits." *See Tegtmeier*, 390 F.3d at 1046-47 (noting that Social Security decisions "are instructive" but not "dispositive" and that a plan's decision "not to reopen the claims process is completely proper, given [the plan's] concern for finality of decisions").

Given the highly deferential standard of review and the thorough review of the evidence upon which the MRC based its decision, we cannot say that the committee's action was "downright unreasonable." Our review, and that of the district court, is limited to the reasons given by the plan administrator and does not extend to reweighing evidence. The MRC reasonably disregarded the tentative findings of Dr. O'Shaughnessy and Dr. Snydersmith that Speciale was disabled due to MS because it was ruled out after the negative lumbar puncture. The only evidence of Speciale's functional capabilities provided to the MRC consisted of the questionnaires completed by Drs. Winny and Keane and Dr. Blonsky's reports. The committee was therefore faced with the conflict between Dr. Winny's questionnaire and Dr. Keane's belief that Speciale could work, along with Dr. Winny's later statement that Speciale could attempt a position that did not require travel. As stated in the

initial letter of denial, the MRC chose to give weight to Dr. Keane's report because of his expertise in pain management and because "his opinion was specific, and quantified." This makes sense, particularly in light of the apparent contradiction between Dr. Winny's questionnaire and her statement to Dr. Blonsky.

Moreover, Speciale never produced any objective evidence that her pain caused any functional limitation. Dr. Blonsky and Nurse Grant were entitled to consider the subjective nature of Speciale's complaints when deciding if she was disabled, and those symptoms, standing alone, were not enough to rise to the level of total disability. *See Ruiz*, 400 F.3d at 992 (noting that "the primary evidence supporting Ruiz's claim that he cannot perform any work for which he is trained was his own subjective complaints of pain" and finding such evidence insufficient to render the administrator's denial unreasonable).

In short, the justifications given by the MRC for its decision—although certainly not indisputable—are reasonable, which is all that is required. *See Davis*, 444 F.3d at 576-77 ("The judicial task here is not to determine if the administrator's decision is correct, but only if it is reasonable."); *Sisto*, 429 F.3d at 701 ("Raising debatable points does not entitle [the claimant] to a reversal under the arbitrary-and-capricious standard."). Because the record contains rational support for the MRC's assessment, we will not disturb its decision to deny Speciale's claim for disability benefits. Accordingly, the judgment of the district court is REVERSED, and the case is REMANDED with instructions to enter judgment in favor of Blue Cross and the Program.

8-7-08