In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1909

CHARLES JENKINS,

*Plaintiff -Appellant,*

*v.*

PRICE WATERHOUSE LONG TERM DISABILITY PLAN,
CONNECTICUT GENERAL LIFE INSURANCE COMPANY, AND
PRICEWATERHOUSECOOPERS LLP,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 06 C 603—**William D. Stiehl,** *Judge.*

ARGUED FEBRUARY 23, 2009—DECIDED MAY 4, 2009

Before EASTERBROOK, *Chief Judge,* and KANNE and
EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* In 1989, when he was 27 years old,
Charles Jenkins started working as a "Senior Account
Consultant" for PricewaterhouseCoopers LLP (PwC). His
tenure with the company was cut short four years later
when he ceased working due to HIV. In 1994, he started
receiving long-term disability benefits under a PwC plan

governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* After making payments for a decade, PwC had second thoughts. Despite a terminal illness that kept him sidelined for more than 10 years, PwC—or, more accurately, the plan administrator, Connecticut General Life Insurance Company (CGLIC)—decided Jenkins could do some work so it cut off his benefits. Jenkins appeals from the district court's order affirming that decision.

When HIV (the virus that causes AIDS) was first reported in the United States in the early 1980s, it was viewed as a death sentence, and a quick one at that. That was probably an exaggeration, but not a ridiculous one. *See* Andrew Sullivan, *Fighting the Death Sentence*, N.Y. Times, Nov. 21, 1995, at A21 (discussing the state of HIV/AIDS treatment and society's view of the disease in the early years). Without treatment, a person who is HIV-positive lives on average only 11 years after infection. World Health Organization & UNAIDS, *AIDS Epidemic Update*, at 10 (December 2007), *available at* http://data.unaids.org/pub/EPISlides/2007/2007_epiupdate_en.pdf. But new medicines (where available[1]) have slashed the death rate and raised the life expectancy of a diagnosed individual dramatically. "A patient diagnosed at 20 today can expect to live to nearly 70, research shows. At 35—the average age of diagnosis in the UK—life expectancy is over 72." Jeremy Laurance, *New Drugs Raise Life Expectancy of HIV Sufferers by 13 Years*, The

---

[1]  Sub-Saharan Africa being a tragic exception.

Independent (July 25, 2008). So, while HIV remains a grave disease—and no cure has yet been found—things have improved. Jenkins is hopefully benefitting from these advances.[2]

Jenkins tested positive for HIV in 1988, but he didn't have serious problems until 1993. By the end of the year, he was no longer able to work. His symptoms included extreme fatigue, lower extremity neuropathy (nerve damage), decreased sensation in his fingers, bilateral manual dexterity limitations, and other opportunistic infections including condylomata (genital warts), myositis (muscle inflammation), and allergic rhinitis (more commonly known as a runny nose).

Jenkins filed a claim under PwC's Long Term Disability Plan (LTD plan), which was underwritten and administered by CGLIC. He alleged that he met the plan definition

---

[2] Another long-time victim of HIV was on national display over the last several weeks. Three decades ago, in a game universally recognized as having changed the face of college basketball, the Michigan State Spartans, led by Earvin "Magic" Johnson, beat Larry Bird and the Sycamores of Indiana State to win the 1979 NCAA basketball championship. Magic Johnson, of course, went on to a brilliant professional career with the Los Angeles Lakers. But in 1991, at the age of 32, he publicly announced that he had HIV. Yet there he was over the last several weeks, with his famous smile ablazing, rooting on the Spartans as they made it into the championship game of the 2009 NCAA Basketball Tournament. In his post-basketball life he formed the Magic Johnson Foundation which is dedicated to combating HIV.

of "total disability"—inability to perform one's own occupation and, later, to perform any occupation within one's qualifications[3]—and CGLIC agreed. Beginning in June 1994, CGLIC paid Jenkins $2,550 per month, or 60 percent of his salary. When the Social Security Administration awarded benefits[4] on top of that, CGLIC reduced its monthly payments by an equal amount, meaning the net pay to Jenkins remained the same. And when the "total disability" standard shifted in 1999, CGLIC confirmed that Jenkins could not work *any* job for which he was qualified, and so he continued to receive benefits without interruption. Thus it went until January 2006, when Jenkins's benefits were terminated.

---

[3] Initially, the plan required Jenkins to show that he was "unable to perform the essential duties of [his] occupation" due to sickness or injury. After benefits were paid for five years, however, Jenkins had to show that he was "unable to perform the essential duties of *any* occupation for which [he was] or m[ight] reasonably [have] become qualified based on his education, training, or experience." (Emphasis added.) The "own occupation, any occupation" model is the norm in LTD plans. *See, e.g.,Tate v. Long Term Disability Plan*, 545 F.3d 555, 557 (7th Cir. 2008).

[4] Jenkins mentions, but does not stress, this point in his brief. And wisely so, as *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), explains that ERISA and SSA questions must be analyzed independently. The Social Security system uses a number of shortcuts (the Grid, the listings) that private insurers do not. AIDS is a listed impairment, so Jenkins automatically qualifies for federal benefits. But the PricewaterhouseCoopers plan does not have any equivalent rule of automatic qualification.

For some reason, CGLIC decided to take a second look at Jenkins's claim beginning in late 2004. (The record doesn't indicate what aroused CGLIC's suspicions, but one possibility is that CGLIC got wind of the fact that Jenkins went on a sojourn to London a year earlier, a venture arguably at odds with his medical limitations.) The medical evidence up to that point supported Jenkins's claim. Just before he stopped work in 1993, Jenkins met with an AIDS specialist, Dr. Steven M. Pounders, who concluded he suffered from "significant fatigue and advanced HIV infection" such that his current job was not sustainable. One month later, Jenkins's CD4 T-cell count was measured at just 155 cells per microliter of blood; anyone with a count lower than 200 is considered to have AIDS by the Centers for Disease Control and Prevention. Eileen Schneider, et al., *Revised Surveillance Case Definitions for HIV Infection Among Adults, Adolescents, and Children* (December 2008), *available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/rr5710a 1.htm?s_cid=rr5710a1_e. Pounders diagnosed Jenkins with AIDS shortly thereafter—also noting the development of anal fissures and increased pain—and determined that Jenkins was incapable of even minimal sedentary activity. In fact, Pounders concluded Jenkins would "never" return to work of any kind. Pounders maintained this position until he transferred Jenkins's case to Dr. David J. Prelutsky, Jenkins's current treating physician, in 1997.

Dr. Prelutsky echoed the prior findings in a disability form submitted in April of 1997, noting limitations in standing, walking, climbing, bending, lifting, and psychological functions. Like Pounders, Prelutsky thought Jenkins would never return to work—even a trial period was out

of the question. At the time, CGLIC basically agreed. In a 1999 internal assessment, CGLIC categorized Jenkins's situation as a "stable and mature claim" in that his "condition was deteriorating with no chance of improvement . . . ."

Five years later, though, CGLIC began to question that assessment. (Again, the timing suggests that the London trip may have been the impetus.) CGLIC asked Dr. Scott Taylor to look into things and, after reviewing Jenkins's file and speaking with Dr. Prelutsky, Taylor concluded that there was not "adequate clinical information or medical documentation" to support the disability claim. Taylor conceded that Jenkins had a low T-cell count but emphasized that it was "stable." Further, Taylor observed that the "viral load" was "undetectable" as of December 2003, and he discounted Jenkins's complaints of fatigue and poor concentration for lack of objective evidence.

For the time being, nevertheless, CGLIC continued to pay Jenkins his benefits. That wouldn't last long. In January 2005, CGLIC had Dr. Barry Kern do an additional review. Like Taylor, Kern did not meet with Jenkins, but rather reviewed his medical records and spoke with Dr. Prelutsky. Kern observed that, although Jenkins's weight and T-cell count had fluctuated considerably over the years, he always weighed over 200 pounds and his T-cell count had stabilized "at about 100." Dr. Kern concluded, "From a functional perspective, the HIV would not prevent [Jenkins] from performing full time light duty or sedentary work."

The next step was an independent medical examination (IME) performed by Dr. Karen Shockley.[5] Dr. Shockley met with Jenkins for an IME in June 2005. Jenkins described his medical history, explaining that in addition to fatigue and rectal pain, he suffered over the years from chronic bronchitis, sinus infections, and nausea. But in 2003, he reported, his condition improved with new medication: his T-cell count went up; his viral count down. Therefore, at the time of the IME, Jenkins described his condition as "stable." That didn't mean he was a picture of health. Jenkins said he couldn't predict his energy level from day to day; he usually struggled through one to two hours of nausea in the morning; one-third of the time he could only manage sitting on the couch all day; and only on "good days" could he tackle something like shopping for groceries. On the other hand, Jenkins told

---

[5] We mean no disrespect to Dr. Shockley—the record gives us no reason to look behind her findings—but we don't want the phrase "**independent** medical examination" to pass without a comment. IMEs are designed to turn a spotlight on claims that are exaggerated or downright fraudulent. They are advertised as, and often passed off as, completely neutral examinations by disinterested medical professionals. But that is not always the case, especially when the professional's bill is paid by an insurance company (or a self-insured employer) with an interest in receiving a report that minimizes, or discounts, a disability claim. How much an IME professional is paid, and how often he or she is used, are certainly important considerations that bear on what weight should be attached to their reports.

Dr. Shockley he could probably work an eight-hour day, just not on a regular basis.

After a physical examination, Dr. Shockley diagnosed Jenkins with "moderately advanced" AIDS, recurrent sinusitis, recurrent bronchitis, hyperlipidemia, and degenerative joint disease. But in line with Jenkins's own view of things, Shockley suggested that he "could perform sedentary work for an 8-hour work day." Shockley doubted whether he could do this "without frequent . . . breaks or . . . absences," but she concluded that he was at least fit to *attempt* full-time employment.[6]

Dr. Prelutsky disagreed. He thought Shockley overestimated Jenkins's abilities, in part because she ignored the possibility of another affliction flowing from his compromised immune system—myositis, or inflammation of the muscles. Prelutsky wrote:

> I agree with Dr. Shockley that [it] is uncertain if the patient can perform [full time] sedentary work for 40 hours per week without frequent work breaks or work absences. In fact, it is more than uncertain, it is without a doubt. Also, Dr. Shockley did not address the patient's other activity-limiting illness, his myositis. Just because we do not have a diagnosis per a muscle biopsy, does not mean that the patient does not have myositis, which . . . is characterized by muscle pain and weakness. I agree that his malaise

---

[6] Physical Therapist Kathleen Schmidt went even further after performing a Functional Capacity Evaluation (FCE). In her opinion, Jenkins could work 40-hour weeks at a "medium" range of exertion.

and fatigue cannot be objectively verified, however, his elevated muscle enzymes certainly go along with the diagnosis of myositis.

In light of all this, Dr. Prelutsky stood by his opinion "that Mr. Jenkins could not perform a full-time sedentary occupation."

But at this point Dr. Prelutsky was in the minority. A rehabilitation specialist identified several positions that met Jenkins's health limitations and qualifications, and a final review by Dr. Kern sealed the deal. On January 3, 2006, Dr. Kern certified that Jenkins's condition remained stable. Given all the medical records—and the fact that myositis had since been ruled out by another doctor—Kern concluded there was nothing preventing Jenkins from performing sedentary work. CGLIC abided by that opinion and terminated benefits at the end of the month.

Jenkins filed an internal appeal in April, enlisting the support of family and friends[7] who testified to his weakened condition. Dr. Prelutsky remained an ally, too, opining once again that Jenkins was not fit to work. But CGLIC had made up its mind; the appeal was denied.

Jenkins followed up with this lawsuit under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), alleging that his benefits were wrongfully terminated. The parties filed cross-motions for summary judgment, and the district

---

[7] One long-time friend, Dan Kasten of Dallas, explained that he accompanied Jenkins on the trip to London. He wrote that Jenkins spent a lot of his time there in bed.

court ruled in favor of the defendants. Jenkins now asks us to overturn that ruling.

We review the district court's ruling *de novo*, which allows us to analyze the plan administrator's determination directly. *See Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 621-24 (7th Cir. 2008). Where, as here, the ERISA plan instills the administrator with discretion to determine who is eligible for benefits, we review its decision under the arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Tate*, 545 F.3d at 559. This standard of review is highly deferential; we only look to ensure that CGLIC's decision has "rational support in the record*." Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006). This doesn't make us a rubber stamp, but it does mean that we cannot reverse course unless a decision is "downright unreasonable." *Id.* In conducting this review, we remain cognizant of the conflict of interest that exists when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due. *Metropolitan Life Ins. Co. v. Glenn*, ___ U.S. ___, 128 S. Ct. 2343, 2346 (2008). In such cases, like the one we have here, the standard of review remains the same, but the conflict of interest is "weighed as a factor in determining whether there is an abuse of discretion." *Id.* at 2350 (internal quotation marks omitted).[8]

---

[8] Nit-pickers might argue that there is a distinction between the arbitrary and capricious standard of review and testing for an abuse of discretion. However, as we noted in *Fritcher v.*

(continued...)

Measured against this standard of review, Jenkins's appeal stands little chance. We emphasize that the question isn't whether *we* would have terminated Jenkins's benefits, but whether CGLIC's decision to do so finds "rational support in the record." It surely does. No fewer than four health professionals concluded that Jenkins could at least attempt full-time sedentary employment. That view may not have been unanimous—Pounders and Prelutsky obviously disagreed—but it was popular. More importantly, it was supported by medical evidence. Jenkins's T-cell count had stabilized, his viral load had diminished, he was not wasting away, and, by his own admission, there were at least some days when he could work a full eight hours.[9] Against this

---

[8] (...continued)

*Health Care Service Corp.*, 301 F.3d 811 (7th Cir. 2002), "this appears to be a distinction without a difference." *Id.* at 816 n.4 (citing *Ladd v. ITT Corp.*, 148 F.3d 753, 754 (7th Cir. 1998), *Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1009 (7th Cir. 1998), and *Gallo v. Amoco Corp.*, 102 F.3d 918, 921 (7th Cir. 1996)). They are "different ways of saying the same thing." *Ladd,* 148 F.3d at 754. Because our cases tend to use the language of the arbitrary and capricious standard, we use that terminology here.

[9] We don't mean to oversimplify or trivialize Jenkins's disease. AIDS is a scourge, and a complicated one at that. For instance, there is question about the significance of T-cell and viral-burden figures, particularly when pharmaceuticals are in the equation. *See, e.g.,* Elinor Burkett, *The Gravest Show on Earth: America in the Age of AIDS*, at xv (Picador 1996) ("Scientists

(continued...)

backdrop, CGLIC's determination simply can't be branded as arbitrary and capricious. That's not to say the evidence compelled that decision, just that it permitted it. And this is not the kind of case where the conflict-of-interest factor plays an important role. In *Glenn*, the Supreme Court said the presence of a conflict will "act as a tiebreaker when the other factors are closely balanced." *Glenn*, 128 S. Ct. at 2351. When the case is borderline, in other words, the inherent conflict of interest that exists in so many of these situations can push it over the edge—towards a finding of capriciousness. *See Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 362 (4th Cir. 2008). This is not one of those borderline cases.

Nevertheless, Jenkins suggests that it is impossible to reconcile the initial determination of disability with the later decision that he could attempt full-time sedentary employment. At best, Jenkins argues, the evidence showed that his condition was stable. If that condition was grave enough to warrant disability in 1994, why wasn't it sufficient in 2006?

---

[9] (...continued)
have become increasingly skeptical about the value of drug-induced increases in T cells, since a number of studies have suggested that while the natural level of T cells are good predictors of the progress of AIDS, drug-provoked increases to do not correlate to longer life."). Fortunately, we need not understand every detail about AIDS or how it has affected Jenkins's life. We simply have to discern whether CGLIC's conclusion was rational.

But Jenkins fails to recognize what CGLIC (and the general population, it seems) thought HIV and AIDS meant in the early 1990s. That impression was that HIV (and certainly AIDS) brought rapid death. Thankfully, the prognosis has changed—in large measure due to new drugs—both for Jenkins and countless others. It was not "downright unreasonable" for CGLIC to shift its position along with that change when the medical evidence supported it.

The judgment of the district court is AFFIRMED.[10]

---

[10] We also affirm the decision to grant summary judgment in favor of PwC itself. The whole time Jenkins received disability benefits from CGLIC, he remained an "employee" of PwC, which provided access to certain additional benefits (like health and life insurance). However, PwC's leave of absence policy provided that once Jenkins's disability benefits stopped, he could only remain on leave for an additional six months before his employment (and the benefits that went along with it) terminated. When Jenkins failed to return to work six months after CGLIC's decision, PwC eliminated Jenkins's employment and extinguished these other benefits. Whatever claim Jenkins may have had against PwC, he admits that it is moot given his loss under the LTD plan. We agree.