In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2617

BRUCE FISCHER,

*Plaintiff-Appellant*,

*v.*

LIBERTY LIFE ASSURANCE COMPANY OF BOSTON
and STEIN ROE INVESTMENT COUNSEL LLC
LONG TERM DISABILITY PLAN,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 3256—**Joan B. Gottschall**, *Judge.*

ARGUED JANUARY 21, 2009—DECIDED AUGUST 4, 2009

Before POSNER, FLAUM, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.*  This case arose after Liberty Life
Assurance Company of Boston ("Liberty") decided to
terminate the payment of long-term disability benefits to
the plaintiff, Bruce Fischer. Fischer tried to reverse that
decision at the administrative level. When he could not,
he sued Liberty and the sponsor of his benefits plan, Stein

Roe Investment Counsel LLC Long-Term Disability Plan (to which we refer collectively as "Liberty"), seeking an order compelling Liberty to continue his benefits. The district court granted Liberty's motion for summary judgment, and Fischer appealed. We conclude that the district court properly applied a deferential standard of review to Liberty's decision, and that, under that standard, there is no reversible error.

# I

## A

Fischer is a 59-year-old man who began working for Stein Roe Investment Counsel, LLC, in May 1996 as the company's lead programmer. On September 22, 2001, he ended his employment with Stein Roe and applied for short-term disability benefits under Liberty's benefits plan ("Plan"), claiming memory loss and attention problems. Liberty approved Fischer's claim and he began receiving short-term disability benefits effective September 22, 2001. Shortly thereafter, Fischer sought treatment from his physician, Dr. Randy Georgemiller. In November 2001, Dr. Georgemiller diagnosed Fischer with "Axis I major depression, recurrent, moderate cognitive disorder NOS, and R/O Dementia, Alzheimer's type, early onset with depression; Axis II no diagnosis; Axis III mild cortical atrophy, diabetes mellitus, hypertension, arthritis, asthma and ulcerative colitis; Axis IV psychological and environmental problems, occupation problems, and economic problem[s]; and Axis V FGAF 50 current." On November 28, 2001, Fischer saw neurologist Dr. Jordan

Waxman, who diagnosed him with "a profound depression with questionable coexistent dementia." In a February 18, 2002, attending physician's statement (a form used by Liberty's claims department), Dr. Robert Greendale, who had examined Fischer each month from June 2001 to January 2002, diagnosed him with major depression secondary to a medical condition. In a similar statement written on February 26, 2002, Dr. Laura LaFave, who had seen Fischer beginning in November 2001, diagnosed him with "severe depression disorder with cognitive impairment" and noted that Fischer had problems with memory and concentration.

On February 20, 2002, Liberty acknowledged that it had received a claim from Fischer for long-term disability benefits. Liberty informed Fischer that since his disability officially began on September 22, 2001, a 180-day waiting period would apply, during which time Liberty would evaluate his eligibility for benefits. Fischer submitted statements from Drs. Waxman, Greendale, and LaFave to Liberty. In addition, presumably in an effort to bolster his claim, Fischer sought diagnoses from additional physicians. On March 21, 2002, Fischer saw neurologist Dr. Zoran Grujic. Dr. Grujic noted that Fischer had some problems with attention, memory encoding, and memory retrieval, but no problems with forgetfulness. (We are not sure how "memory retrieval" differs from forgetfulness, but Dr. Grujic drew this distinction.) Dr. Grujic also recorded that Fischer had a history of encephalitis as a child and that he suffered from "periods of zoning out" that were occasionally accompanied by urinary inconti-nence. Based on these observations, Dr. Grujic suggested

the "possibility of a partial complex seizure disorder as a contributor to his decline" and also noted that Fischer's preliminary test results and age were "atypical" for Alzheimer's disease. Dr. Grujic thus recommended further examinations, including a long-term electroencephalography ("EEG") study and a positron emission tomography ("PET") scan.

On May 24, 2002, Liberty approved Fischer's claim for long-term disability benefits, retroactive to March 21, 2002, at a level representing 60% of his pre-disability earnings (because his condition was pre-existing). Liberty also told Fischer that, as the Plan required, his disability status would be "evaluated relative to [his] inability to perform material and substantial duties of his occupation" for the first 24 months, and thereafter his status would be "evaluated relative to [his] inability to perform the material and substantial duties of his own or any occupation for which he has training, education, or experience." Liberty noted that, because of the nature of his illness, which it described as major depression, Fischer was subject to the Plan's limitation for mental illnesses. Under this provision, benefits for a disability attributable to "Mental Illness, Substance Abuse, or Non-Verifiable Symptoms" were subject to a 24-month maximum. The Plan also contained an exception to that rule:

> Benefits may exceed this limitation only if the Covered Person is confined to a hospital or institution for Mental Illness or Alcohol or Drug Abuse, or is participating in an Extended Treatment Plan established in writing by a Physician in lieu of hospitaliza-

tion. The extension of benefits beyond the 24 month limitation is subject to review by Liberty.

Liberty also alerted Fischer to the fact that there was no guarantee that he would receive benefits for the full 24-month benefit period.

On July 25, 2002, Fischer underwent a PET scan. The results of the test were first reviewed by Dr. Grujic on August 13, 2002. Dr. Grujic noted that the PET scan raised the possibility of early Alzheimer's disease. In his view, however, taking Fischer's medical history as a whole, Fischer could not properly be diagnosed with Alzheimer's without further testing. Dr. Grujic thought that the unusual PET scan results might be attributable to the encephalitis that Fischer had suffered as a child. In addition, taking into account a 24-hour EEG that also had been performed and returned negative results, Dr. Grujic continued to believe that Fischer might have an underlying seizure disorder and thought that Fischer might benefit from medications for that condition.

On February 3, 2003, Liberty's consulting neuro-psychologist, Dr. James Taylor, reviewed Fischer's case. Dr. Taylor was unaware that Fischer had completed EEG and PET studies the previous summer. In the absence of such studies, Dr. Taylor decided that further neuropsychological testing was needed to evaluate Fischer's work capacity. Dr. Taylor thought that prior assessments of Fischer's neuropsychological and neuro-logical status did not conclusively establish his level of functional impairment and were in any event too dated to be used to evaluate his current work capacity.

Dr. Taylor wanted to rule out the possibility that some of Fischer's functional losses were the result of a mood disorder and thus reversible. As a result, he recommended that Liberty follow up to see whether EEG and PET studies had been completed or conduct a new neuropsychological evaluation of Fischer.

On April 18, 2003, Liberty advised Fischer that his long-term disability benefits would be discontinued because his treating physicians, Drs. LaFave and Greendale, had failed to verify his ongoing disability status. Liberty informed him that he could ask Liberty in writing to review this determination within 180 days. Fischer responded to this letter by submitting additional medical records, including a neuropsychological evaluation report from Dr. Georgemiller. Dr. Georgemiller noted that his findings indicated "global, progressive cognitive deficits in conjunction with significant depression," and while Fischer's intellectual skills fell into the "very superior" range, he had "reduced mental speed and visual spatial skills" as well as reduced "flexible thinking and susceptibility to losing his problem solving set with distraction." Dr. Georgemiller stated that when Fischer's performance was compared to his performance 16 months earlier, "there is significant decrement in his working memory, mental speed, attention and concentration, mental flexibility, and visual spatial abilities." Dr. Georgemiller's conclusion was that Fischer was "very depressed but his mood disorder does not appear to be the sole etiology of his cognitive and functional deficits." The doctor recommended "[a]ggressive psychopharmacological treatment" for Fischer's depression to

"assist in improving his mood and [to] promote a higher level of functioning," coupled with "[p]harmacological agents to mitigate the effects of progressive cognitive decline." In May 2003, at Liberty's request, Dr. James Butcher, Liberty's consulting physician, also administered a number of personality and behavioral tests to Fischer. Dr. Butcher's results were reported in his "Outpatient Mental Health Interpretive Report," submitted to Liberty on September 15, 2003. That report indicated that Fischer's results were consistent with depression and hysteria, and that Fischer was likely suffering from a non-organic dysthymic disorder (that is, a chronic, but less severe, form of depression).

Fischer formally appealed Liberty's decision to discontinue his long-term disability benefits in a letter to Liberty dated June 11, 2003. Fischer asserted that the medical evidence established that he was, and remained, disabled "as the result of a severe neurocognitive impairment." Liberty reopened Fischer's claim on June 23, 2003, and referred his case to a consulting physician, Dr. Melvyn Attfield, to determine precisely what Fischer's primary disabling condition was. Dr. Attfield confined himself to reviewing the file. Based on that review, he concluded that there was insufficient evidence of a disorder that was primarily neurological and that Fischer's clinical presentation was predominantly psychological, not organic. Dr. Attfield also stated that the neurological examinations performed by Dr. Georgemiller were inconsistent and methodologically flawed, and he recommended that Fischer undergo an independent neurological evaluation. In response, Liberty referred Fischer to

Dr. Steven Rothke, a clinical neuropsychologist and rehabilitation psychologist. On February 5, 2004, Dr. Rothke evaluated Fischer, reviewed his medical history, and performed an independent psychiatric evaluation of him. Dr. Rothke concluded that Fischer's test results showed no significant decline in intellectual functioning, concentration, recall, or memory. Dr. Rothke noted that on the test most sensitive to brain impairment, Fischer performed within the normal range. Dr. Rothke stated that he did not believe that Fischer had any progressive dementing condition. Dr. Rothke's diagnosed mild depression (although he admitted that the testing could not rule out the presence of a medical or neurological condition or explain the MRI and PET scan findings). In response to Dr. Rothke's findings, Fischer submitted to Liberty a report authored by Dr. Grujic, who opined that Fischer's July 2002 and September 2003 PET scans, his clinical presentation, and his results on several tests were consistent with organic impairment, although the source of that impairment was unclear.

On March 23, 2004, Liberty again wrote to Fischer and notified him that, based on its initial determination that he was subject to the 24-month limitation for mental illnesses, his benefits expired on March 20, 2004. Liberty left the door open to change, however, insofar as it also told him that it was "currently gathering information to assess [his] continued eligibility for benefits beyond this date" and that he would "continue to receive benefits during this review." True to its word, Liberty then submitted Fischer's medical records to neurologist Dr. Dawn Kleindorfer. Dr. Kleindorfer reviewed Fischer's file and

concluded that the objective findings did not support a diagnosis of dementia. She qualified that conclusion with a note that Fischer does have "suggestive PET scanning of a dementing process that I would want to follow clinically overtime [sic]." Dr. Kleindorfer also specified that Fischer's neuropsychological testing "reveals very superior functioning on all levels of testing" and that she did not "feel that he has any objective evidence of impairment." Liberty also submitted Fischer's medical records to Dr. Elizabeth Gallup who, on April 30, 2004, opined that "the cornerstone of the diagnosis of Alzheimer's or any dementia is cognitive impairment, particularly in short-term memory . . . [but that, in Fischer's case,] . . . no cognitive impairment exists."

On May 25, 2004, relying on Fischer's medical records and the reports of Drs. Attfield, Rothke, Kleindorfer, and Gallup, as well as those of Fischer's treating physicians, Liberty determined that Fischer's primary disability was major depression, a mental/nervous condition. This meant that the Plan's 24-month limitation for mental illnesses applied, and Liberty therefore discontinued Fischer's benefits. Liberty's letter informed Fischer that he had a right of review pursuant to the Employee Retirement Income Security Act ("ERISA"), and that any request for a review needed to be sent in writing within 60 days of his receipt of its determination of ineligibility and had to be supported by medical records of treating physicians recorded after December 1, 2003. Fischer appealed Liberty's decision on November 23, 2004; he argued that he was disabled because he suffered from a seizure disorder, dementia, and other physical conditions

such as diabetes, colitis, hypertension, asthma, and arthritis. Fischer contended that Liberty's decision was contrary to Liberty's own interpretive rule, which says, "Only when it can be determined that the claimant is disabled solely from a psychological basis can the limitation be applied." On December 20, 2004, Liberty advised Fischer that he had until January 20, 2005, to submit any additional evidence he believed would support his case; Fischer did not submit any further evidence, and Liberty proceeded to conduct another review of Fischer's case.

For the purpose of this stage of the proceedings, Liberty assigned a Nurse Case Manager to go through Fischer's file and decide whether Fischer was disabled as a result of any physical conditions or organic brain disorder. The Nurse Case Manager concluded that two peer reviews were necessary in order to answer this question. Fischer's file was accordingly referred to internist Dr. Eugene Truchelut and neuropsychologist Dr. Cris Johnston. Dr. Truchelut was asked to review any physical impairment that Fischer might have. He opined that Fischer had a torn rotator cuff in the right shoulder that would limit him to lifting no more than 20 pounds and that suspicion of partial complex seizures made it appropriate to restrict Fischer's exposure to unprotected heights and limit his operation of machinery, but he found that there was no other physical condition that would limit his ability to return to work. Dr. Johnston was asked to review Fischer's history from a psychological and neurological perspective; he determined that a diagnosis of dementia was premature. Dr. Johnston concluded that, based on Fischer's neuropsychological test scores, "there

is no question that he has the cognitive capacity to function adequately in a wide range of jobs." Based on these findings, Liberty upheld its determination that Fischer was ineligible for benefits beyond the 24-month mental illness limitation period.

## B

On June 1, 2005, Fischer filed this action pursuant to 29 U.S.C. § 1132(a)(1)(B) to reinstate his long-term disability benefits. Following the close of pleadings, the parties filed cross-motions for summary judgment under FED. R. CIV. P. 56. Although the district court initially denied both parties' motions, on reconsideration it granted summary judgment in Liberty's favor. The court explained that it had made an error of law in its initial ruling when it concluded that Liberty's motion should be denied because a "reasonable fact finder might disbelieve Liberty's doctors, or find that Liberty's decision to disregard the evidence of physical disability provided by Fischer's doctors to be arbitrary and capricious." The court concluded that it had applied an incorrect standard of review, and when the appropriate arbitrary and capricious standard was applied, it was clear that the "court's earlier determination . . . [was] insufficient to defeat the presumption of reasonableness to which Liberty's determination is entitled under Seventh Circuit precedent." Fischer has appealed from the district court's final judgment in favor of Liberty.

**II**

While this court ordinarily reviews a district court's grant of summary judgment *de novo,* that standard operates somewhat differently when we are looking at the determination of an ERISA plan administrator whose decisions are entitled to deferential review (that is, whose decisions may be set aside only if they are arbitrary and capricious). Under *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), if a benefits plan confers discretionary authority to determine eligibility and benefits under the plan, then judicial review is deferential; if it does not, then the court makes an independent decision. See *Krolnik v. Prudential Insurance Co.*, No. 08-2616, 2009 WL 1838298 at *1 (7th Cir. June 29, 2009). Both parties agree that the arbitrary and capricious standard is the appropriate standard of review for Fischer's case. Fischer argues, however, that this standard has been modified by the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008). Under *Glenn*, he asserts, less deference is required in cases like this one, where the administrator operates under a conflict of interest.

We recently dealt with much the same argument in *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823 (7th Cir. 2009). There, the plaintiff claimed that *Glenn* calls for "a more penetrating scope of judicial review than has previously been utilized." *Id.* at 830 (internal quotation marks omitted). We held that "[o]ur study of *Glenn* convinces us . . . that the decision is best read as an extension of the Court's previous decision in *Firestone* . . . ." *Id.* at 831. We explained that

[f]airly read, *Glenn* explains how the general principle established in *Firestone* should be applied to the more specific case in which responsibility for both claim determinations and pay-outs is vested in the same entity. In such a situation, a court is required to take such an obvious conflict of interest into consideration—along with all of the other relevant factors— in determining whether the entity's determination was arbitrary and capricious. . . . [T]he Court's decision in *Glenn* did not create a new standard of review—a "heightened arbitrary and capricious standard"—for claims involving a conflict of interest.

*Id.*

The correct standard of review to be applied therefore remains the arbitrary and capricious standard, but one of the factors that must be taken into account in applying that standard is any conflict of interest. See *Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. # 506,* 545 F.3d 555, 559 (7th Cir. 2008) (where an ERISA plan gives discretionary authority to determine eligibility for benefits, a denial of benefits is reviewed under the arbitrary and capricious standard); see also *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856 (7th Cir. 2009) ("This doesn't make us a rubber stamp . . . . [and] we remain cognizant of the conflict of interest that exists when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due."). Under the arbitrary and capricious standard, we will uphold an administrator's determination unless it is

"downright unreasonable." *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006) (internal quotation marks omitted). We have held that an administrator's determination will be upheld so long as it is possible to offer a reasoned explanation, based on the evidence, plan documents, and relevant factors that encompass the important aspects of the problem. *Sisto v. Ameritech Sickness and Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005). Nevertheless, even under this deferential standard of review, the determination to deny benefits and the termination procedure must comply with the ERISA mandate that "specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for 'full and fair review' by the administrator." *Tate*, 545 F.3d at 559 (quoting *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 688 (7th Cir. 1992)) (internal quotation marks omitted). We will not uphold a termination of benefits if there is no support in the record for the ultimate decision. *Id.* (citing *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774-75 (7th Cir. 2003)).

Fischer maintains that Liberty's decision that he is ineligible for benefits beyond 24 months is unreasonable because his illness is the result of an organic brain injury, and therefore he is not subject to the Plan's mental illness limitation. He urges that Liberty's discontinuation of his benefits is presumptively arbitrary and capricious because Liberty failed to follow its own internal guidelines when it applied the mental illness limitation to his case. He also insists that Liberty's decision is arbitrary and capricious because it ignored

objective evidence that demonstrates that his impair-
ment is organic, not psychological.

If we were making an independent decision about
Fischer's disability, his second argument would certainly
give us pause. The record, which we have recounted in
detail above, contains ample evidence that his illness
was in significant part organic. But we are not the finder
of fact here. The problem for Fischer is that the record
also contains reputable evidence that the sole cause of
Fischer's disability (in the sense of his inability to
perform any job) was depression, a psychological disease.
What Fischer is essentially arguing is that Liberty's deci-
sion can be upheld only if a preponderance of the
evidence, or something like that, supports it. As the
district court correctly recognized on reconsideration,
however, that is not the standard.

Measured against the arbitrary and capricious standard
of review, Fischer cannot prevail. The question, we
repeat, is whether Liberty's decision to deny Fischer
benefits finds rational support in the record. It does. No
fewer than seven doctors concluded that the sole or
primary cause of Fischer's disability was depression, a
psychological disease, not an organic disease. Three
doctors thought that his disability was exclusively psycho-
logical. In addition, one of the doctors who concluded
that the cause of Fischer's impairment was psychological,
opined that the methodology employed by Fischer's
treating physicians to diagnose him with an organic
brain disorder was flawed. In the face of this evidence,
Liberty's determination cannot be branded as arbitrary

and capricious. This is not to say that the evidence *compelled* Liberty's decision; it is merely to say that the evidence permitted it. While Fischer did present substantial evidence that his condition was organic, it was not an abuse of discretion for Liberty to reject Fischer's evidence in favor of contrary and, at least in Liberty's view, more compelling evidence.

This is not the type of case in which the *Glenn* conflict-of-interest factor plays an important role. As we noted, the Supreme Court in *Glenn* instructed that the presence of a conflict will "act as a tiebreaker when the other factors are closely balanced . . . ." *Glenn*, 128 S. Ct. at 2351. In other words, "[w]hen the case is borderline . . . the inherent conflict of interest that exists in so many of these situations can push it over the edge—towards a finding of capriciousness." *Jenkins*, 564 F.3d at 861-62. This is not a borderline case; in light of Liberty's consideration of no fewer than thirteen expert opinions, it is not possible to say that Liberty's decision was even close to "downright unreasonable."

The judgment of the district court is AFFIRMED.