# United States Tax Court

162 T.C. No. 2

SYDNEY ANN CHANEY THOMAS,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 12982-20.                    Filed January 30, 2024.

_____

P and her spouse H filed joint federal income tax returns for 2012, 2013, and 2014, but did not pay the full amount of tax shown on each return. After H's death, P sought relief from joint and several liability pursuant to I.R.C. § 6015(f). R denied P's request, and P petitioned our Court seeking a determination under I.R.C. § 6015(e).

P and R agree that P meets the seven "threshold conditions" that must be satisfied for a requesting spouse to be eligible for equitable relief under I.R.C. § 6015(f). *See* Rev. Proc. 2013-34, § 4.01, 2013-43 I.R.B. 397, 399–400, *modifying and superseding* Rev. Proc. 2003-61, 2003-2 C.B. 296. But they disagree on whether, under the facts and circumstances, P is entitled to relief.

P contends that she is entitled to a streamlined determination to grant equitable relief under I.R.C. § 6015(f). *See* Rev. Proc. 2013-34, § 4.02, 2013-43 I.R.B. at 400. In the alternative, P contends that she is entitled to relief under the equitable factors set forth in Rev. Proc. 2013-34, § 4.03(2), 2013-43 I.R.B. at 400–03. R disputes both contentions.

Also for our Court's consideration is an evidentiary issue. R objects to the admissibility of certain letters in the

administrative record on the ground that they are inadmissible hearsay. P counters that the letters are admissible regardless of the hearsay rule given that I.R.C. § 6015(e)(7) instructs our Court to review the administrative record, which includes the disputed letters.

> *Held*: Applying Rule 802 of the Federal Rules of Evidence, the Court overrules R's hearsay objection.

> *Held, further*, P is not entitled to equitable relief under I.R.C. § 6015(f).

---

*Megan L. Brackney*, for petitioner.

*Julie V. Skeen* and *Sharyn M. Ortega*, for respondent.

TORO, *Judge*: This case arises from a request by petitioner, Sydney Ann Chaney Thomas, for relief from joint and several liability under section 6015[1] with respect to the 2012, 2013, and 2014 taxable years. In a previous opinion we resolved an evidentiary matter that arose during trial. *See Thomas v. Commissioner*, No. 12982-20, 160 T.C. (Feb. 13, 2023) (reviewed). The two remaining issues for decision are (1) whether certain letters in the administrative record on which Ms. Thomas relies must be excluded from evidence as inadmissible hearsay and (2) whether Ms. Thomas is entitled to relief under section 6015(f). As we discuss below, we resolve the first issue in favor of Ms. Thomas and the second issue in favor of the Commissioner.

## FINDINGS OF FACT

The parties have filed a Stipulation of Facts as supplemented and related Exhibits. We incorporate the parties' Stipulation of Facts as supplemented and the attached Exhibits by this reference. We tried this case during the Court's San Francisco, California, trial session, on

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C.), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary values to the nearest dollar.

April 4, 2022. Ms. Thomas resided in California when she filed her Petition.

I. *Ms. Thomas and Mr. Thomas*

Ms. Thomas is a business owner, part-time college instructor, and former bank employee. She holds a bachelor of science degree in political science and government and economics from Oregon State University.

In 1994, Ms. Thomas married her next-door neighbor, Tracy A. Thomas. Mr. Thomas held a finance degree and worked for Halliburton. He eventually transitioned into a career in the construction industry.

The Thomases' marriage initially was a happy one, and the couple went on to have two daughters. Eventually, they purchased a 2,366-square-foot, 4-bedroom, 2½-bath, single-family home in Moraga, California (Moraga Property), an affluent suburb of San Francisco. Around this time, Mr. Thomas was making good money, so Ms. Thomas stopped working to take care of their children. Also around this time, the Thomases purchased a 2,025-square-foot, 3-bedroom, 2½-bath second home that was built in 2007 in the Tahoe National Forest (Truckee Property) near various ski resorts in the Lake Tahoe area. Mr. Thomas also purchased a five-carat diamond ring for Ms. Thomas that she still owned at the time of trial.

II. *The Thomases' Finances and Their Tax Problems*

As the years went by, the Thomases' relationship began to break down. Coinciding with their growing marital problems, the Thomases began experiencing financial problems. Sometime between 2007 and 2009, Mr. Thomas stopped receiving regular bonuses from his employer as a result of the global financial crisis. He eventually left his job for others in the construction industry.

Around this time, the Thomases were having trouble making credit card and mortgage payments. At one point, they defaulted on approximately $125,000 in credit card debt. And in 2011 the Moraga Property went into foreclosure. But, before the Moraga Property could be auctioned off, Ms. Thomas got the home out of foreclosure. Then, to help pay their mortgages in 2012, 2013, and 2014, the Thomases took early retirement distributions of $95,000, $90,000, and $78,300, respectively, from an individual retirement account. Ms. Thomas knew about the early retirement distributions when they occurred.

For the 2012, 2013, and 2014 tax years, the Thomases jointly filed federal income tax returns with the Internal Revenue Service (IRS). Ms. Thomas signed these returns. In relevant part, each return reported income tax due in excess of the amount the Thomases paid. The 2012 return reported unpaid income tax of $21,016. The 2013 return reported unpaid income tax of $24,868. And the 2014 return reported unpaid income tax of $27,219. The Thomases did not pay these amounts at the time they filed their returns, and most of the amounts remained outstanding at the time of trial. Ms. Thomas knew about the underpayments at the time the Thomases filed their returns.

Around this time, Ms. Thomas sold property she had inherited from her mother and used a portion of the proceeds to buy a 2013 Land Rover for her personal use.

On December 1, 2013, Ms. Thomas wrote to the IRS with respect to the Thomases' 2012 return, requesting relief from at least part of their unpaid tax liabilities. In this letter, Ms. Thomas said that the Thomases "will have to resort to pulling even more money out of [their] nearly depleted retirement account to pay the remaining [balance] for the 2012 tax year." Stipulation of Facts Ex. 7-J, at 1.

In 2016, Mr. Thomas texted Ms. Thomas that "[t]he taxes and mortgages have been dealt with [and] now it is in IRS and Chase's court." Stipulation of Facts Ex. 6-J, at 20. However, this was not the end of the Thomases' tax issues. The Thomases continued to argue over their finances. In July 2016, for example, the Thomases argued about a $1,000 plane ticket Ms. Thomas purchased for their daughter to go to Hawaii. In 2016, they also argued over various personal expenses incurred by Ms. Thomas and their daughters (who at the time of trial were 21 and 22 years old), including a trip to Paris Ms. Thomas was taking with one daughter, among other expenditures. And they argued about expenses for Ms. Thomas's sailing apparel business, Ocean SF, in which Mr. Thomas had invested.

On July 26, 2016, Mr. Thomas passed away, leaving Ms. Thomas as his sole heir. Mr. Thomas's estate consisted primarily of his interest in the Moraga Property and the Truckee Property, as well as a 2004 Lexus, a Porsche Boxster, and a golf membership at a country club. Ms. Thomas also was left to deal with the finances and unpaid income taxes.

In the years following Mr. Thomas's death, Ms. Thomas traveled to New York with one of her daughters to celebrate that daughter's birthday. She also traveled to Rome, Paris, and Florence, to Napa for wine tastings, and to Tahoe for skiing with her daughters. She took out loans to put her daughters through college, gave one daughter $3,500 for an advanced math class, and paid for her daughters' cell phones and car insurance.

During these same years, Ms. Thomas maintained a blog. She blogged about Mr. Thomas, her two daughters, her lifestyle, and Ocean SF. She blogged about her various trips with her daughters and about purchasing her daughter "a gorgeous bottle green Dior bag for her 18th birthday." Stipulation of Facts Ex. 13-J, at 29. In the same blog post, she stated that she "own[s] five bags," including a "white Italian Furla," two from Kate Spade, and a "black woven Bottega Veneta." *Id.* The following day, she blogged about paying a business coach "$220 per hour" for private sessions. *Id.* at 49. In another post from about a year after Mr. Thomas died, Ms. Thomas wrote that she would "listen[] politely as friends said, you have to sell your Tahoe house, and be realistic. For the record, I will never sell my Tahoe house. Ever." *Id.* at 15.

III. *Ms. Thomas's 2018 Bankruptcy*

On October 1, 2018, Ms. Thomas filed for bankruptcy. As part of her bankruptcy proceedings, on December 12, 2018, she filed Official Form 106Sum, Summary of Your Assets and Liabilities and Certain Statistical Information. On her Form 106Sum, she reported combined monthly income of $9,515 and monthly expenses of $7,650. She also reported the values of her two properties, the Moraga Property and the Truckee Property. She reported the value of the Moraga Property as $1,488,865 and the value of the Truckee Property as $681,246.

On January 14, 2019, the bankruptcy case was dismissed.

IV. *The Request for Innocent Spouse Relief*

On July 16, 2019, Ms. Thomas filed with the IRS Form 8857, Request for Innocent Spouse Relief, seeking, in relevant part, relief from her unpaid tax liabilities for the 2012, 2013, and 2014 tax years.

On November 19, 2019, Ms. Thomas submitted additional documentation to the IRS in support of her claim for relief. Among the documents she sent to the IRS were letters from two of her friends that

she relied on to support her claim for innocent spouse relief, including one from Gina Cefalu, which discussed Ms. Thomas's attempt to sell her Moraga Property in 2018.

On March 12, 2020, Ms. Thomas spoke with the IRS hearing examiner reviewing her request for innocent spouse relief. During this call, she told the IRS hearing examiner that her income was $6,800 per month and that her expenses were $4,320 per month.

On September 8, 2020, the IRS denied Ms. Thomas's request for innocent spouse relief. On November 9, 2020, she petitioned our Court for review. As of March 28, 2022, Ms. Thomas's unpaid federal tax liabilities (not including accrued interest) were $6,715 for 2012, $26,311 for 2013, and $27,607 for 2014, or $60,633 in total.

V.    *Ms. Thomas's Income*

At the time of trial, Ms. Thomas was receiving income from various sources. Among them were her Truckee Property, which she sometimes rented out, her part-time teaching role at the University of California, Berkeley, her leadership training business, and various side jobs such as catering, home staging, and both dog walking and dog sitting. With respect to her Truckee Property, Ms. Thomas leased out the property from January 15 to March 30, 2022, for two weeks each month. In total, she received at least $13,500 from this rental agreement. Also in February and March 2022, Ms. Thomas rented her Truckee Property through Airbnb during the times her lessee was not there. In total, she received approximately $4,550 from her Airbnb reservations.

Ms. Thomas also operated her own sailing apparel business. The record does not disclose how much income she received from this business. But, for 2020, Ocean SF reported on its Form 1120, U.S. Corporation Income Tax Return, total income of $15,542 and a net operating loss of $4,621.[2]

In addition to the monthly income Ms. Thomas reported during her bankruptcy in December 2018 and to the IRS in March 2020, Ms. Thomas reported adjusted gross income for 2017 of approximately $72,000. Furthermore, her checking account statement for February 8 to March 7, 2022, shows total deposits of $9,693, including deposits from

---

[2] The Form 1120 shows the name of the entity as "Ocean SP Inc," rather than Ocean SF, which we assume is typographical error.

Venmo and Zelle accounts totaling $2,805 and a "Mobile Deposit" of $4,500.

VI.     *Ms. Thomas's Assets*

Relevant to this case, at the time of trial Ms. Thomas continued to own both the Moraga Property and the Truckee Property.[3]

In September 2018, Ms. Thomas listed the Moraga Property for sale with the help of her realtor friend Ms. Cefalu.  A listing for the property shows that it was on the market from September 12 until September 20, 2018.  The listing price for the property was $1.45 million. The property was not sold.  In the letter from Ms. Cefalu accompanying Ms. Thomas's submission to the IRS on November 19, 2019, Ms. Cefalu indicated that the "feedback we received on the home in the first weekend was that it was $200K overpriced."  Stipulation of Facts Ex. 6-J, at 12.  But, in December 2018, Ms. Thomas reported the value of the Moraga Property as $1,488,865 on her bankruptcy Form 106Sum, nearly $40,000 more than what she had listed the property for three months earlier.

With respect to the Truckee Property, in July 2019, the Placer County, California, Assessor's Office sent Ms. Thomas a letter reporting that the property had a value of $670,000 for tax assessment purposes. A similar home across the street from Ms. Thomas's Truckee Property sold at some point before trial for $1.1 million.

As of March 15, 2022, the outstanding principal on the Moraga Property was $1,068,028.  But Ms. Thomas had been delinquent on the Moraga Property mortgage for a number of years and the ending balance of her account, including charges for principal, interest, taxes and insurance, as well as expenses paid by the loan servicer, was $1,400,577. Also as of March 15, 2022, the outstanding principal on the Truckee Property was $630,008, and the ending balance of Ms. Thomas's account was $631,777.  Her monthly payments on the Truckee Property were at least $2,882.

---

[3] She also continued to own the five-carat diamond ring, but has presented no evidence as to its value, other than to testify that "there's not a big resale for rings like that."  Trial Tr. 77.

## OPINION

Before we begin our discussion of the merits, we address the Commissioner's argument that certain contents of the administrative record (i.e., letters from third parties that Ms. Thomas submitted to the IRS during her administrative hearing) are inadmissible hearsay in our Court. In short, they are not.

The rule against hearsay applies only when it is not supplanted by federal statute, other rules of the Federal Rules of Evidence, or any rules prescribed by the Supreme Court. Fed. R. Evid. 802; *see also* 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:64 (4th ed. 2023) ("[Rule 802] bars hearsay evidence unless other federal Rules or Acts of Congress pave the way to admit hearsay.").[4] In the context of innocent spouse relief, section 6015(e)(7) provides such a supplanting statute. Specifically, it instructs us to base our determinations on "the administrative record established at the time of the [IRS's] determination" and "any additional newly discovered or previously unavailable evidence." I.R.C. § 6015(e)(7). The statute does not provide any limitations on our consideration of the administrative record. And there is no dispute between the parties that the administrative record includes the letters Ms. Thomas submitted to the IRS in 2019. To apply the rule against hearsay to exclude these documents from our consideration would undermine Congress's clear direction as articulated in section 6015(e)(7).

More generally, the Commissioner's assertion that the Federal Rules of Evidence should be applied to limit our review of the administrative record in innocent spouse cases would seem to swallow our scope of review in such cases, potentially rendering much of the administrative record subject to challenge. It would make little sense for proceedings in which Congress has instructed us to review the administrative record to devolve into lengthy disputes over which aspects of the record may actually be considered. And section 6015 does not permit such an outcome.

---

[4] Fed. R. Evid. 802. The Rule Against Hearsay—

Hearsay is not admissible unless any of the following provides otherwise:

- a federal statute;
- these rules; or
- other rules prescribed by the Supreme Court.

Our analysis is consistent with the views the Advisory Committee to the Federal Rules of Evidence expressed when recommending the adoption of Rule 802. The Advisory Committee Notes explain that the rule against hearsay does not apply to any "hearsay which is made admissible by other rules adopted . . . by Act of Congress" even though such hearsay otherwise "would not qualify under these Evidence Rules." Fed. R. Evid. 802 advisory committee note to 1972 proposed rules. The Notes then list illustrative examples of circumstances in which Congress has provided such a supplanting rule. The examples include 29 U.S.C. § 161(4), which describes procedures for hearings and investigations of the National Labor Relations Board and allows affidavits as proof of service in certain circumstances. Another example is 10 U.S.C. § 8900 (previously 10 U.S.C. § 7730), which provides that, in judicial proceedings related to certain suits against the United States, affidavits may sometimes be accepted as evidence in lieu of testimony. Similarly here, Congress provided a special rule for the evidence our Court considers in a particular category of cases, and we are not free to disregard its instruction. *Cf., e.g.*, *Wagner v. Minn. Life Ins. Co.*, 184 F. Supp. 3d 845, 849–50 (D. Mont. 2016) (noting that two exhibits found in the administrative record the court was reviewing were admissible under Rule 802 even though they would otherwise constitute hearsay); *United States v. Clarke*, 628 F. Supp. 2d 15, 18 (D.D.C. 2009) (noting the "inescapable conclusion that, to the extent Rules 801 through 803 are inconsistent with [the relevant statutory provision,] 8 U.S.C. § 1443(e), the more specific provision—§ 1443(e)—governs and requires that the certificate of naturalization be admitted into evidence" (citing Fed. R. Evid. 802)), *aff'd sub nom. United States v. Straker*, 800 F.3d 570 (D.C. Cir. 2015) (per curiam).

Our analysis is also consistent with how courts have approached more typical administrative record cases, in which a court generally reviews the record to decide whether an agency's action was an abuse of discretion. *See, e.g.*, *Black v. Long Term Disability Ins.*, 582 F.3d 738, 746 n.3 (7th Cir. 2009) ("The Federal Rules of Evidence . . . do not apply to an ERISA administrator's benefits determination, and we review the entire administrative record, including hearsay evidence relied upon by the administrator." (citing *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 622 n.4 (7th Cir. 2008))). It has long been settled that administrative agencies are not bound by the Federal Rules of Evidence. *See FTC v. Cement Inst.*, 333 U.S. 683, 705–06 (1948); *see also* Fed. R. Evid. 101(a) (noting that the Federal Rules of Evidence "apply to proceedings in United States courts"). Accordingly, agencies generally may consider hearsay evidence in support of a contested

finding of fact. *See Richardson v. Perales*, 402 U.S. 389, 402 (1971); *Calhoun v. Bailar*, 626 F.2d 145, 148–49 (9th Cir. 1980); *Hoonsilapa v. INS*, 575 F.2d 735, 738 (9th Cir. 1978). And in reviewing an agency's determination for abuse of discretion, courts may consider hearsay evidence as substantial evidence supportive of an agency finding of fact. *See Perales*, 402 U.S. at 402, 407–08; *Calhoun*, 626 F.2d at 149 ("To constitute substantial evidence, hearsay declarations, like any other evidence, must meet minimum criteria for admissibility—it must have probative value and bear indicia of reliability."). We see no indication that Congress intended a different result in this context, where we review the administrative record de novo.

Of course, as in a case we review for abuse of discretion, here (where we review de novo) there may be questions as to whether evidence in the administrative record is probative and reliable. *See Perales*, 402 U.S. at 407–08; *Calhoun*, 626 F.2d at 149; *see also Marino v. Commissioner*, T.C. Memo. 2021-130, at *21–23. And, in determining whether evidence in the administrative record is probative and reliable, we may consider indicia of reliability such as whether a document is or contains hearsay. We necessarily consider such questions as part of our de novo review of the claims Ms. Thomas advances. The Commissioner, however, is not entitled to strike portions of the administrative record on hearsay grounds.[5] Rather, based on the congressional command in section 6015(e)(7), Ms. Thomas is allowed to rely on the administrative record for whatever it can bear.

In short, by statute, we are required to consider the full administrative record and must therefore overrule the Commissioner's hearsay objection with respect to the letters. *See* Fed. R. Evid. 802.

We now turn to the merits of this case.[6]

---

[5] If the Commissioner wanted to test the contents of the letters, he could have called their authors as witnesses at trial. But he did not do so.

[6] In his Reply Seriatim Brief, the Commissioner objects to various articles cited in Ms. Thomas's brief on the grounds that they are inadmissible hearsay, violate the rules pertaining to expert witness testimony, and were not admitted as evidence at trial. The Commissioner also filed a Motion to Strike (Doc. 72) raising similar objections to these cited articles. The Commissioner is correct that evidence, including evidence in the nature of expert testimony, cannot be submitted on brief. But we do not interpret Ms. Thomas's arguments that way. And, in any event, the articles to which the Commissioner objects do not affect the outcome of this case. We therefore will deny the Commissioner's Motion.

I.  *Joint and Several Liability*

Married taxpayers may elect to file a joint federal income tax return.  I.R.C. § 6013(a).  If a joint return is made, the tax is computed on the spouses' aggregate income, and each spouse is fully responsible for the accuracy of the return and is jointly and severally liable for the entire amount of tax shown on the return or found to be owing.  I.R.C. § 6013(d)(3); *Pullins v. Commissioner*, 136 T.C. 432, 437 (2011).  But in certain circumstances, a spouse who has made a joint return may seek relief from joint and several liability under procedures set forth in section 6015.  I.R.C. § 6015(a).  Section 6015 provides a requesting spouse with three alternatives:  (1) full or partial relief under subsection (b), (2) proportionate relief under subsection (c), or (3) if relief is not available under subsection (b) or (c), equitable relief under subsection (f).  *Pullins*, 136 T.C. at 437.

As the parties agree, subsections (b) and (c) do not apply in this case because we have before us only an underpayment of tax, not an understatement of tax or a deficiency, as required by subsections (b) and (c).  *Pullins*, 136 T.C. at 437 n.5.  Therefore, the only relief available is under subsection (f).  *See Pullins*, 136 T.C. at 437 n.5; *see also Washington v. Commissioner*, 120 T.C. 137, 146–48 (2003).  And we have jurisdiction to consider Ms. Thomas's request for relief from joint and several liability.  *See* I.R.C. § 6015(e)(1)(A).

Ms. Thomas generally has the burden of proving her entitlement to relief under section 6015(f).  *See* Rule 142(a); *Porter v. Commissioner*, 132 T.C. 203, 210 (2009) (reviewed).  As we have discussed, we review the Commissioner's determination to deny relief under a de novo standard of review.  I.R.C. § 6015(e)(7).[7]  Also, as we stated above, the scope of our review is limited to "the administrative record established at the time of the [Commissioner's] determination, and . . . any additional newly discovered or previously unavailable evidence."  *Id.*  We will consider the 36 stipulated Exhibits admitted into evidence in this case, which were either part of the administrative record or otherwise fall within section 6015(e)(7).  *See Thomas*, 160 T.C., slip op. at 4–5.  We will also consider Ms. Thomas's trial testimony because it was "unavailable evidence" at the time of the administrative proceeding. *See, e.g.*, *Freman v. Commissioner*, T.C. Memo. 2023-10, at *10; *Sleeth*

---

[7] As discussed in our opinion of February 13, 2023, in this case, paragraph (7) applies to this case because Ms. Thomas filed her Petition after July 1, 2019.  *See Thomas*, 160 T.C., slip op. at 4–5.

*v. Commissioner*, T.C. Memo. 2019-138, at \*3, *aff'd*, 991 F.3d 1201 (11th Cir. 2021).

## II.     *Relief Under Section 6015(f)*

As relevant to this case, when relief is unavailable under section 6015(b) or (c), section 6015(f) grants the Commissioner discretion to relieve a requesting spouse of joint liability if, considering all of the circumstances, it would be inequitable to hold the requesting spouse liable for the unpaid tax, or any portion thereof.   Section 6015(f) authorizes granting such equitable relief "[u]nder procedures prescribed by the Secretary."

As is the case here, for requests filed on or after September 16, 2013, and for requests pending in any federal court on or after September 16, 2013, Revenue Procedure 2013-34, 2013-43 I.R.B. 397, *modifying and superseding* Rev. Proc. 2003-61, 2003-2 C.B. 296, prescribes factors that the Commissioner considers in determining whether equitable relief is appropriate under section 6015(f).  *See also* Treas. Reg. § 1.6015-4(c).   We consult the same factors as the Commissioner when considering a request for relief.  *See Pullins*, 136 T.C. at 438 (citing *Washington*, 120 T.C. at 147–52); *see also Jones v. Commissioner*, T.C. Memo. 2019-139, at \*13–14, *aff'd*, No. 20-70013, 2022 WL 327473 (9th Cir. Feb. 3, 2022).  But we are not bound by them. *See Minton v. Commissioner*, T.C. Memo. 2018-15, at \*12 (collecting authorities).

Section 4.01 of Revenue Procedure 2013-34 sets forth seven so-called threshold conditions that must be satisfied for a requesting spouse to be eligible for equitable relief under section 6015(f).   The parties agree that Ms. Thomas meets the threshold conditions, so we will not discuss them further.

## III.     *Streamlined Determination Under Revenue Procedure 2013-34*

When, as here, the threshold conditions are satisfied, section 4.02 of Revenue Procedure 2013-34 describes circumstances in which the Commissioner will make a streamlined determination to grant equitable relief under section 6015(f).   To be eligible for a streamlined determination, the requesting spouse must establish that she (1) is no longer married to the requesting spouse, (2) would suffer economic hardship if relief were not granted, and (3) did not know or have reason to know that the nonrequesting spouse would not or could not pay the underpayment of tax reported on the joint income tax return.

Rev. Proc. 2013-34, § 4.02, 2013-43 I.R.B. at 400; *see also Severance v. Commissioner*, T.C. Memo. 2023-101, at *13. Because of Mr. Thomas's death, the first requirement is satisfied. The parties dispute whether Ms. Thomas has satisfied the second and third requirements for a streamlined determination. Because Ms. Thomas has not established that she would suffer economic hardship if she is not granted relief under section 6015(f), we conclude that she is not eligible for a streamlined determination. We therefore need not address the third requirement.

### A.   *Economic Hardship*

Under the Revenue Procedure, economic hardship exists "if satisfaction of the tax liability in whole or in part will cause the requesting spouse to be unable to pay reasonable basic living expenses." Rev. Proc. 2013-34, § 4.03(2)(b), 2013-43 I.R.B. at 401; *see also* Treas. Reg. § 301.6343-1(b)(4). The requesting spouse must demonstrate that imposing joint and several liability is "'inequitable in present terms,' *Von Kalinowski v. Commissioner*, T.C. Memo. 2001-21, and poses a present economic hardship." *Pullins*, 136 T.C. at 446. We have "consistently looked beyond the taxable year at issue to apply subsection (f)," *Hall v. Commissioner*, 135 T.C. 374, 380 (2010), and we evaluate the requesting spouse's financial situation and prospects as of the time of trial, *see Pullins*, 136 T.C. at 446–47.

A requesting spouse can demonstrate economic hardship by showing that (1) her annual income is below 250% of the federal poverty guidelines[8] or (2) her monthly income exceeds her reasonable basic monthly living expenses by $300 or less. Rev. Proc. 2013-34, § 4.03(2)(b), 2013-43 I.R.B. at 401. To demonstrate economic hardship, the requesting spouse must also show that she does not have assets from which she can make payments toward the tax liability and still meet her reasonable basic living expenses. *Id.*; *see also Pocock v. Commissioner*, T.C. Memo. 2022-55, at *22–23. If she fails to satisfy either requirement, then the Commissioner "will consider all facts and circumstances (including the size of the requesting spouse's household)

---

[8] The federal poverty guidelines are updated periodically in the Federal Register by the U.S. Department of Health and Human Services (HHS) under the authority of 42 U.S.C. § 9902(2). In January 2022, HHS published new guidelines, which set the federal poverty line for a one-person household at $13,590 and for a three-person household at $23,030. Annual Update of the HHS Poverty Guidelines, 87 Fed. Reg. 3315, 3316 (Jan. 21, 2022); *see also Parker v. Commissioner*, T.C. Memo. 2022-110, at *7 n.5.

in determining whether the requesting spouse would suffer economic hardship if relief is not granted." Rev. Proc. 2013-34, § 4.03(2)(b), 2013-43 I.R.B. at 401.

### B. *Application to Ms. Thomas*

To show that she will suffer an economic hardship if she is not granted innocent spouse relief, Ms. Thomas contends that we should find that her annual income is less than 250% of the federal poverty line and that she does not otherwise have sufficient assets to pay off the federal income tax liabilities and still adequately meet her reasonable basic living expenses. But, as we discuss below, Ms. Thomas has not adequately supported either claim.[9]

### 1. *Ms. Thomas's Income*

We first consider Ms. Thomas's claim that her annual income is less than 250% of the federal poverty line. Specifically, she claims that the record supports "total annual income of, at best, approximately $37,800 per year." Pet'r's Answering Br. at 77. Assuming, as Ms. Thomas proposes, that she has a household size of three people,[10] her annual income would fall below 250% of the federal poverty line if it were less than $57,575 ($23,030 × 2.5 = $57,575) as of the time we tried this case. While Ms. Thomas has presented some evidence of her income, there are significant holes in the record that preclude us from concluding that her total income is below 250% the federal poverty line.

We begin by noting that Ms. Thomas has provided us with little documentary evidence to support her claim that her annual income is what she approximates, and certainly not enough to satisfy her burden of proof on the matter. To the extent she has provided us with documentation, some of the documents suggest that her income is far greater than $37,800 per year. For example, she has provided a lease agreement and a list of Airbnb reservations showing total rental income of over $18,000 from her Truckee Property during the first three months of 2022. This alone suggests that her income approximation may be low. Additionally, Ms. Thomas has provided us with her checking account

---

[9] Ms. Thomas also has not provided us with an adequate basis for calculating her reasonable basic monthly living expenses beyond providing her mortgage statements. For that reason alone, we could conclude that she has not satisfied her burden of proof. Nevertheless, we will address her arguments.

[10] We note that this is a generous assumption given that Ms. Thomas's two daughters are both adults.

statement for February 8 to March 7, 2022. This statement shows nearly $9,700 in deposits during that one-month period. Among these deposits are unexplained amounts totaling $2,805 from Venmo and Zelle accounts and a "Mobile Deposit" of $4,500. Suppl. Stipulation of Facts Ex. 22-P, at 2–4. If these deposits reflect Ms. Thomas's regular income, then they would show that her annual income far exceeds $37,800. And Ms. Thomas has made no effort to explain these deposits.

Ms. Thomas's testimony about her income is similarly unhelpful to her case.[11] At one point she testified that on average she receives about $35,000 annually in rental income, $3,200 every ten weeks she teaches at the University of California, Berkeley, and $100 every two weeks from a client to whom she provides leadership coaching. This income alone would place her above the $37,800 she approximates.[12] But Ms. Thomas also testified that she does "a lot of side hustles," including catering and home staging, which provide her additional income that she reports "in [her] tax returns." Trial Tr. 115:3–7. Relatedly, she testified that her "2021 taxes are going to have a lot of different sources of income." Trial Tr. 115:18–19. Noticeably absent from her testimony is an estimate of her income from these various side jobs. One can reasonably ask if the unexplained deposits into her checking account are from these "side hustles." But because the record does not disclose her income from these sources, we are left to guess at the total amount of her income.

The record is also silent about any income Ms. Thomas may receive from her sailing apparel business. Although Ms. Thomas testified that her business is "highly unprofitable," Trial Tr. 112:23, the only documentation on the record in support of her testimony is a copy of Ocean SF's tax year 2020 return, which shows that Ocean SF reported a loss from the business of $4,621 for the year. Given that we tried this case more than a year later, we find the information on Ocean SF's 2020 tax year return an unreliable metric for determining what income Ms. Thomas received from the business in 2022. Again, it is certainly possible that her sailing apparel business accounts for some of the

---

[11] We note that, throughout the trial, we were troubled by inconsistencies in Ms. Thomas's testimony, which appeared to change according to what would be most helpful in the moment. In multiple respects we found her to be an unreliable witness.

[12] At another point, however, Ms. Thomas testified that she earned only $1,000 per month in rental income "at the most." Trial Tr. 9:25–10:1.

unexplained deposits into her checking account, and Ms. Thomas has not presented anything to the contrary.

Finally, we note that the income amounts Ms. Thomas claims on brief are generally inconsistent with the income amounts she previously reported to the IRS and during her bankruptcy. For her 2017 tax year, the record shows that Ms. Thomas reported about $72,000 in adjusted gross income. During her 2018 bankruptcy, Ms. Thomas reported receiving income of approximately $9,500 per month. The record further shows that, in March 2020, she told an IRS hearing examiner that she had monthly income of approximately $6,800. Nothing in the record persuades us that her circumstances have changed significantly since March 2020. And these prior accounts of Ms. Thomas's income are closer to the amount the record actually supports than to her $37,800 estimate—an amount that would represent income of only $3,150 per month.

Accordingly, for the reasons discussed above, Ms. Thomas has not established that her income is less than 250% of the federal poverty line.

2. *Ms. Thomas's Assets*

Next, we address Ms. Thomas's argument that she lacks sufficient assets from which she can pay her federal tax liabilities while still meeting her reasonable basic living expenses. Upon a review of the record, we conclude that Ms. Thomas has not demonstrated that she has insufficient equity in her two homes to cover her federal income tax liabilities while also meeting her reasonable basic living expenses.

In support of her claim, Ms. Thomas provided various documents that she says establish the fair market values of her Moraga Property and her Truckee Property. She also testified about the condition of these properties. On the basis of the information in the record, Ms. Thomas argues that the value of the Moraga Property is $1.25 million and the value of her Truckee Property is $670,000. If one were to credit the values Ms. Thomas proffers and her ending account balances on the mortgages for the two properties at the time of our trial ($1,400,577 and $631,777), the expected proceeds from sales of the properties would be insufficient to cover the amounts owed, leaving nothing to satisfy Ms. Thomas's federal income tax liabilities.[13] But Ms. Thomas has not

_____

[13] We note that Ms. Thomas herself does not press this position. Instead, she argues on brief that her equity in the Truckee Property at the time of trial was

demonstrated that the true values of her properties are what she says they are, and the record suggests the values are actually much higher.

### a. *The Moraga Property*

We begin with the Moraga Property. Ms. Thomas's proposed valuation is based upon a property listing from September 2018, which shows that the home was listed for $1.45 million. Then, Ms. Thomas relies on a letter from her realtor friend dated November 14, 2019, in which her friend says that the "feedback we received on the home in the first weekend was that it was $200k overpriced." Taken together, Ms. Thomas says that these documents establish that her Moraga Property is worth approximately $1.25 million. Ms. Thomas's reasoning is unpersuasive.

First, the documents she relies on are several years old. They purport to value the property as of September 2018 when the relevant timeframe for our analysis is when we tried this case in April 2022. *See Pullins*, 136 T.C. at 446–47; *see also Braen v. Commissioner*, T.C. Memo. 2023-85, at *33 (questioning the reliability of comparable property sales from five years before the year at issue in determining the value of property). Ms. Thomas herself testified at trial that the values of her homes, both in affluent, desirable areas, have "popped up" since 2018 "because we've had just such a crazy real estate [market]." Trial Tr. 46:9. Ms. Thomas has made no effort to quantify this "pop up," whereas the Commissioner has submitted an estimate from a well-known commercial website placing the home's value in excess of $2.1 million. Even if the Commissioner's estimate is off base because of deferred maintenance and other factors, as Ms. Thomas contends, just a modest rate of appreciation over the 3½-year timeframe would result in a potentially material increase in valuation for purposes of this case. Indeed, the mere fact that Ms. Thomas's lender has allowed her to remain in the home without making payments for a number of years suggests that the lender views the Moraga Property as significantly appreciated and its position as appropriately collateralized. Ms. Thomas has offered no evidence to fill these gaps or dispel these inferences.

---

"approximately $40,000" and her equity in the Moraga Property was "approximately $94,000." Pet'r's Answering Br. at 79. She argues that after "paying closing costs and commissions, she likely would not have enough left to cover [her taxes]." *Id*. But, for the reasons we discuss, she has not supported that these amounts accurately reflect her equity in the two properties.

Second, nothing in the record indicates that the original listing price or Ms. Thomas's friend's comments that her home was overpriced were backed by sufficient data and expertise. Ms. Thomas did not call her friend to testify about the Moraga Property, so we have little basis from which to judge her qualifications for appraising real estate. And Ms. Thomas has not obtained a formal appraisal.

Finally, Ms. Thomas's own bankruptcy filing from three months after the property was listed for sale contradicts her valuation. In the filing from December 2018, Ms. Thomas reported the value of the Moraga Property as $1,488,865, a much higher amount than the $1.25 million valuation she proffers now. Even the self-reported value from her bankruptcy listing, which does not reflect the "pop-up" of the intervening 3½ years, might leave her with enough equity in her two properties to pay her unpaid taxes and meet her reasonable basic living expenses. And accounting for intervening appreciation of the property from 2018 to the time of trial in 2022, Ms. Thomas's equity would more than cover her debts.

b. *The Truckee Property*

Next, we consider Ms. Thomas's claim that her Truckee Property (a 2,025-square-foot, 3-bedroom, 2½-bath second home a short distance from multiple ski resorts in the Lake Tahoe area) is worth $670,000. As with the Moraga Property, we do not believe this valuation is established by the record.

Ms. Thomas's estimated valuation is based solely on a letter dated July 2019, from the Placer County, California, Assessor's Office, which reported the assessed value of her Truckee Property for property tax purposes as $670,000 as of January 1, 2019. Again, this document is several years old and does not purport to reflect the property's value as of the time we tried this case. Moreover, there is no indication that the assessed value in the letter actually represented the fair market value of the property at the time. It, again, is simply an assessed value for property tax purposes, and nothing in the record indicates that it was backed by a fair market value appraisal.

As with the Moraga property, the Commissioner submitted an estimate from a well-known commercial website placing the fair market value of the Truckee Property over $1.2 million around the time of trial. And Ms. Thomas herself testified that the "exact same home on the same side of the street" sold for $1.1 million three months before trial—

exceeding what she says her property is worth by more than $400,000. Trial Tr. 111:13–16. Although she also testified that this other home is in a better condition than her property,[14] even a generous $200,000 price reduction to account for any difference in condition would give her $270,000 in equity—presumably more than enough to pay her federal tax liabilities after accounting for closing costs, commission, and taxes.

In short, Ms. Thomas has not demonstrated that her equity in either of her two properties is insufficient to meet her income tax liabilities. And the record does not support her claim that selling either of the two properties to pay her federal tax liabilities would leave her without the ability to pay her reasonable basic living expenses.[15] Accordingly, we conclude that Ms. Thomas has not established that she will suffer economic hardship if relief is not granted. Nor do we believe that the facts and circumstances of this case, as revealed by the record, warrant such a conclusion. Thus, she is not entitled to a streamlined determination.

IV. *Equitable Factors*

For cases in which the threshold conditions are met, but the requesting spouse is not eligible for a streamlined determination, section 4.03(2) of Revenue Procedure 2013-34 sets out seven nonexclusive factors to be considered in determining whether a requesting spouse is entitled to equitable relief under section 6015(f). Those factors are: (1) the taxpayer's marital status, (2) whether the requesting spouse will suffer economic hardship absent relief, (3) whether the requesting spouse had knowledge or reason to know that the nonrequesting spouse would not or could not pay the income tax liabilities, (4) whether either spouse had a legal obligation to pay the liabilities, (5) whether the requesting spouse significantly benefited

---

[14] Ms. Thomas testified at several points that both her homes have significant "deferred maintenance." Trial Tr. 46:10, 47:5–6, 58:11. But in describing her expenses she also testified that "we do a lot of maintenance" on the Truckee Property, which, according to Placer County public records, was only 15 years old at the time of trial. Trial Tr. 111:7. And the pictures she offered into evidence of the Truckee Property (showing, for example, scratched doors) do not suggest hundreds of thousands of dollars in damage.

[15] Although Ms. Thomas argues that she relies on renting her Truckee Property for income, for reasons already discussed, we are unpersuaded that she would be left with insufficient proceeds from a sale of the property after paying her federal tax liabilities to continue meeting her reasonable basic living expenses for at least a reasonable period.

from the underpayments, (6) whether the requesting spouse has complied with income tax laws in the years following those to which the request for relief relates, and (7) the mental or physical health of the requesting spouse. Rev. Proc. 2013-34, § 4.03(2), 2013-43 I.R.B. at 400–03. These factors are to be weighted appropriately, and no one factor is determinative. *Id.* at 400; *see also Yancey v. Commissioner*, T.C. Memo. 2017-59, at \*19 (collecting cases).

The only factors in dispute are whether Ms. Thomas will suffer economic hardship absent relief, whether Ms. Thomas knew or had reason to know that Mr. Thomas would not or could not pay the income tax liabilities, and whether Ms. Thomas significantly benefited from the underpayment. The parties agree that the other factors are neutral. As we will discuss below, we believe that the facts and circumstances of this case weigh against granting the relief Ms. Thomas seeks. Accordingly, we find for the Commissioner.

A. *Economic Hardship*

For the reasons discussed above, we conclude that Ms. Thomas has not established that she will suffer economic hardship absent relief. *See supra* Opinion Part III. Accordingly, this factor is neutral. *See* Rev. Proc. 2013-34, § 4.03(2)(b).

B. *Knowledge or Reason to Know*

We now turn to whether Ms. Thomas knew or had reason to know of the underpayments of income tax underlying this case.

1. *Applicable Principles*

In the case of an income tax liability that was reported but not paid, this factor weighs in favor of relief if the requesting spouse reasonably expected the nonrequesting spouse to pay the liability within a reasonable period after the filing of the return. Rev. Proc. 2013-34, § 4.03(2)(c)(ii), 2013-43 I.R.B. at 401; *see also Jones*, T.C. Memo. 2019-139, at \*18. A reasonable expectation of payment is presumed if the spouses submitted a request for an installment agreement to pay the taxes by the later of 90 days after the due date for payment of the tax or 90 days after the return was filed. Rev. Proc. 2013-34, § 4.03(2)(c)(ii).

The factor weighs against relief, however, if the requesting spouse's expectation was unreasonable in view of all the facts and circumstances. *Id.* For example, if, before the filing of the income tax

return, the requesting spouse knew that the nonrequesting spouse had financial difficulties or other issues with the IRS or other creditors, or was aware of difficulties in timely paying bills, then this factor generally weighs against relief. *Id.*

Other facts and circumstances considered in determining whether the requesting spouse had reason to know whether the nonrequesting spouse could or would pay a reported income tax liability include, but are not limited to, the requesting spouse's level of education, any deceit or evasiveness of the nonrequesting spouse, the degree of the requesting spouse's involvement in the activity generating the liability, the requesting spouse's involvement in business or household financial matters, the requesting spouse's business or financial expertise, and any lavish or unusual expenditures compared with past spending levels. *Id.* § 4.03(2)(c)(iii), 2013-43 I.R.B. at 402; *see also Minton*, T.C. Memo. 2018-15, at *13–15 (collecting cases and analyzing the circumstances in which our Court found that a requesting spouse had (or did not have) knowledge or reason to know that the nonrequesting spouse would fail to pay a liability).

Notwithstanding the requesting spouse's knowledge or beliefs, that knowledge may be negated, and this factor will weigh in favor of the requesting spouse, if the nonrequesting spouse abused the requesting spouse or maintained control of the household finances by restricting the requesting spouse's access to financial information such that the nonrequesting spouse's actions prevented the requesting spouse from questioning or challenging payment of the liability. Rev. Proc. 2013-34, § 4.03(2)(c)(ii); *see also Pocock*, T.C. Memo. 2022-55, at *25. "Abuse comes in many forms and can include physical, psychological, sexual, or emotional abuse, including efforts to control, isolate, humiliate, and intimidate the requesting spouse, or to undermine the requesting spouse's ability to reason independently and be able to do what is required under the tax laws." Rev. Proc. 2013-34, § 4.03(2)(c)(iv), 2013-43 I.R.B. at 402; *see, e.g.*, *Stephenson v. Commissioner*, T.C. Memo. 2011-16, 2011 WL 219010, at *9. This Court takes all facts and circumstances into account in determining the presence of abuse, *see* Rev. Proc. 2013-34, § 4.01, and requires substantiation, or at a minimum, specificity, with regard to allegations of abuse, *see Nihiser v. Commissioner*, T.C. Memo. 2008-135, 2008 WL 2120983, at *9. A generalized claim of abuse is insufficient. *Pocock*, T.C. Memo. 2022-55, at *26 (citing authorities).

### 2.    *Application to Ms. Thomas*

To begin, the record shows that Ms. Thomas knew of the unpaid tax liabilities initially when the relevant returns were filed, a point which she explicitly acknowledges in her brief.[16]  *See* Pet'r's Sur-Reply Br. 19 ("Initially, [Ms. Thomas] knew that [Mr. Thomas] was not paying the amounts due for 2012-2014.").   Nevertheless, she argues that Mr. Thomas told her that he was handling the taxes as, for example, when he texted her in 2016:  "The taxes and mortgages have been dealt with [and] now it is in IRS and Chase's court."  But given that this text message came at least a year after the 2014 return due date, we do not see how it supports Ms. Thomas's argument that she reasonably expected Mr. Thomas to pay the liabilities within a reasonable time of when payment was due.  *See* Rev. Proc. 2013-34, § 4.03(2)(c)(ii).  And given their extensive history of financial problems, we seriously doubt that Ms. Thomas's expectation of payment was reasonable.

Despite her knowledge of the unpaid tax liabilities, Ms. Thomas argues that this factor should favor relief because she was abused by her husband and consequently was unable to question his payment of the taxes.  In support of Ms. Thomas's claim that she was abused, the record includes numerous descriptions of physically abusive behavior and financial control, both general and specific, allegations of financial control, as well as examples of verbally abusive text messages and emails.  The Commissioner has provided little to refute these claims of abuse.  So, according to the Revenue Procedure, this factor will weigh in favor of relief if the abuse prevented Ms. Thomas from questioning or challenging payment of the liability.  *See id.*

Ms. Thomas provided some general testimony that she "was scared to ask [Mr. Thomas] questions" related to the unpaid taxes.  Trial Tr. 120:7–8.  Furthermore, many of her allegations of abuse, if true, could reasonably cause someone to fear questioning a spouse for fear of reprisal.  But other aspects of the record suggest that Ms. Thomas may not have been afraid to question Mr. Thomas's financial decisions.  For example, the record discloses several times when Ms. Thomas expressly disagreed with Mr. Thomas about financial decisions.  And

---

[16] Notably, the record includes copies of the 2012–14 tax year returns, which Ms. Thomas signed, showing unpaid income tax amounts for the years.  Furthermore, Ms. Thomas sent a letter to the IRS in December 2013 seeking relief from the unpaid income tax liability for the 2012 tax year.   These documents, even without Ms. Thomas's acknowledgment, indicate that she knew, or at least should have known, of the unpaid tax liabilities around the time the returns were filed.

Ms. Thomas has never actually stated on the record that she disagreed with the nonpayment of the taxes; she has said only that she disagreed with the decision to take early distributions from the retirement account, which underlaid at least some of the underpayments in this case.

On the basis of the record before us, we have some doubt that this factor weighs in favor of Ms. Thomas. But even if we were to find that this factor favors relief on account of the abuse Ms. Thomas alleges, we would find that it is outweighed by the significant benefit to her from the unpaid income tax liabilities, which we will discuss below. *See* Rev. Proc. 2013-34, § 4.03(2) ("In evaluating a claim for relief, no one factor or a majority of factors necessarily determines the outcome. The degree of importance of each factor varies depending on the requesting spouse's facts and circumstances."); *see also* Treas. Reg. § 1.6015-2(d).

C.    *Significant Benefit*

A "significant benefit" is any benefit in excess of normal support, such as owning luxury assets and taking expensive vacations. Rev. Proc. 2013-34, § 4.03(2)(e), 2013-43 I.R.B. at 402; *see also* Treas. Reg. § 1.6015-2(d). This factor weighs against relief if the requesting spouse received a significant benefit due to the unpaid income tax liabilities. Rev. Proc. 2013-34, § 4.03(2)(e); *see also* Treas. Reg. § 1.6015-2(d). But if the nonrequesting spouse controlled the household and business finances or there was abuse such that the nonrequesting spouse made the decisions on spending for a lavish lifestyle, then this factor is neutral. Rev. Proc. 2013-34, § 4.03(2)(e).

The record contains several examples of the significant benefits to Ms. Thomas while her income tax liabilities have remained unpaid. To start, Ms. Thomas has benefited from owning two properties, both in desirable areas, in which, as we discussed above, she may have significant equity. To maintain these two properties, the Thomases took early retirement distributions to pay the mortgages. These early distributions partially underlaid the unpaid tax liabilities connected to this case. And in using those proceeds to pay the mortgages, instead of allocating a proper share to pay the taxes, Ms. Thomas directly benefited from the unpaid liabilities. Even if she initially objected to taking the early retirement distributions, this in no way reduces the resulting benefits to her (i.e., owning two properties).

Next, Ms. Thomas significantly benefited from her purchase of a luxury vehicle (the 2013 Land Rover) using proceeds she received from an inheritance instead of paying the unpaid tax liabilities. The proceeds that went to the Land Rover purchase alone might have covered a significant share of the liabilities in this case. And while Ms. Thomas testified that a portion of the inheritance went to pay the taxes, the record does not disclose how much or for which year(s).

The record also discloses several vacations that Ms. Thomas and her daughters enjoyed while the tax liabilities remained unpaid. This includes Ms. Thomas's paying for her daughter's $1,000 plane ticket to fly to Hawaii in 2016, taking her daughters on European vacations, and taking other trips to Napa Valley and New York. While Ms. Thomas testified that she did not pay all of these expenses herself, the record supports a finding that many of them were paid out of her own pocket. She also has continued to pay significant education expenses and other expenses for her daughters, both of whom were adults at the time of trial and for several years before.

Finally, Ms. Thomas's blog also provides insight into her various expenses since the unpaid tax liabilities arose. For example, Ms. Thomas blogged about purchasing a green Dior bag for her daughter's 18th birthday as well as owning several designer bags herself. She has also blogged about paying a business coach $220 an hour for private sessions. While Ms. Thomas may argue that her blog does not reflect her reality, she has not convinced us that she did not incur these expenses. And again, these expenses demonstrate how she has significantly benefited from her unpaid taxes.

To the extent Ms. Thomas might argue that this factor is neutral on account of abuse, a significant share of the lavish expenditures were made by Ms. Thomas and not Mr. Thomas, as the examples above demonstrate. And to the extent that she argues that some of these purchases were made when she thought the taxes were paid, Revenue Procedure 2013-34 draws no such distinction between expenses made before a requesting spouse knows about unpaid liabilities and those made after. In any event, the record shows that many of the lavish expenses described above, including the Land Rover, vacations, education expenses, and the green Dior bag, were incurred at times when Ms. Thomas knew about the tax problems. So even if the legal distinction she attempts to draw were accepted, her argument would be contradicted by the factual record.

Finally, so far as Ms. Thomas argues that many of her expenses were not in excess of normal support as measured by her particular circumstances, *see Porter*, 132 T.C. at 212 (citing *Estate of Krock v. Commissioner*, 93 T.C. 672, 678–79 (1989)), as a factual matter she has not demonstrated that the expenses were normal to her when they were paid. Given her testimony about her changing financial circumstances over time, beginning as early as at least 2009, we believe that many of the expenses that may have once been normal to her likely no longer constituted normal support at the times relevant to this case. Therefore, we find that her argument lacks sufficient support in the record.

Because Ms. Thomas has significantly benefited from not paying her tax liabilities, we conclude that this factor weighs against relief.

D.     *Conclusion*

After weighing all of the facts and circumstances, we find that Ms. Thomas is not entitled to relief under section 6015(f). Specifically, we find she has significantly benefited from the underpayments of income tax underlying this case, which weighs heavily against her entitlement to relief. Notably, the unpaid tax liabilities are at least partially attributable to early retirement distributions that were used to make payments on mortgages on properties she continues to own and in which she appears to have significant equity. It is not inequitable to hold Ms. Thomas liable for the underpayments when she has failed to demonstrate that she lacks sufficient equity in the properties to pay the federal tax liabilities in full. And further weighing against her relief is her continued spending for a lavish lifestyle despite knowing about the unpaid liabilities and well after Mr. Thomas passed away. Thus, even if the knowledge factor were treated as weighing in favor of relief on account of abuse, Ms. Thomas has not shown that the facts and circumstances here warrant granting relief.

To reflect the foregoing,

*An appropriate order will be issued, and decision will be entered for respondent.*